111 T.C. No. 1


UNITED STATES TAX COURT


CONSOLIDATED MANUFACTURING, INC., M. P. LONG LIVING TRUST, MERL
PHILIP LONG, TRUSTEE, TAX MATTERS PERSON, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 6176-96.                          Filed July 20, 1998.


Company C (C), an automobile parts remanufacturer required to take inventories pursuant to sec. 471,[1] elected under sec. 472 to apply the last-in, first-out (LIFO) inventory method of accounting with respect to certain raw materials (raw materials one), labor, and overhead included in its inventories, but not with respect to certain other raw materials (raw materials two) included therein as to which C continued to use the first-in, first-out (FIFO) inventory method and the lower of cost or market (LCM) basis of valuation (C's method of valuing raw materials two).

_____

[1] Unless otherwise indicated, all section references are to the Internal Revenue Code (Code) in effect for the years at issue. All Rule references are to the Tax Court Rules of Practice and Procedure.

Respondent determined that C's method of reporting only raw materials one, labor, and overhead on the LIFO inventory method (C's LIFO method) does not clearly reflect income because it is contrary to the requirements of sec. 472 and the regulations thereunder and that therefore C's election to use that method should be terminated.

Respondent further determined that C's method of valuing raw materials two did not reflect the proper amounts for those raw materials under the FIFO inventory method and the LCM basis of valuation permitted by sec. 471.

Held: Respondent did not abuse respondent's discretion in determining that C's LIFO method does not clearly reflect income because it is contrary to the requirements of sec. 472 and the regulations thereunder and that therefore C's election to use that method should be terminated.

Held, further: Respondent did not abuse respondent's discretion in determining that C's method of valuing raw materials two does not clearly reflect income because it did not reflect the proper amounts for those raw materials under the FIFO inventory method and the LCM basis of valuation permitted by sec. 471.

Eric S. Namee and James Scott MacBeth, for petitioner.

Michael J. O'Brien, David G. Hendricks, Karen J. Goheen, and Jeffery G. Mitchell, for respondent.

CHIECHI, Judge: Respondent determined the following S corporation adjustments to the ordinary, distributable net, or taxable income of Consolidated Manufacturing, Inc. (Consolidated):

|       | Adjustments to Ordinary, Distributable Net, or |
| Year  | Taxable Income |
|-------|----------------|
| 1990  | $3,730,862     |
| 1991  | 123,596        |

The issues remaining for decision are:

(1) Did respondent abuse respondent's discretion in determining that Consolidated's method of reporting certain raw materials, labor, and overhead on the LIFO inventory method and certain other raw materials on the FIFO inventory method does not clearly reflect income because it contravenes the requirements of section 472 and the regulations thereunder and that therefore Consolidated's election to use that method should be terminated? We hold that respondent did not.

(2) Did respondent abuse respondent's discretion in determining that Consolidated's method of valuing certain raw materials does not clearly reflect income because it did not reflect the proper amounts for those raw materials under the FIFO inventory method and the LCM basis of valuation permitted by section 471? We hold that respondent did not.

## FINDINGS OF FACT[2]

Most of the facts have been stipulated and are so found.

---

[2] Unless otherwise indicated, our Findings of Fact and Opinion pertain to 1990 and 1991, the years at issue.

Consolidated, an S corporation, had its principal place of business in Hutchinson, Kansas, at the time the petition was filed.  The M.P. Long Living Trust is Consolidated's tax matters person.

Consolidated's Business

Consolidated engaged in the recovery, reconditioning, and restoration to salable condition of used and worn automobile parts, including engines, crankshafts, cylinder heads, transmissions, and various smaller parts, which it sold as remanufactured automobile parts to its customers.  (We shall refer to the foregoing activities in which Consolidated engaged as remanufacturing.)  Consolidated was authorized by Ford Motor Company (Ford) to produce specified remanufactured automobile parts and sell them within certain counties in Kansas, Missouri, and Arkansas to Ford-authorized dealers (Consolidated's Ford customers) as Ford remanufactured automobile products. Consolidated's Ford customers sold the remanufactured automobile parts that they had purchased from Consolidated to wholesale and retail consumers.

Consolidated also produced and sold remanufactured engines, crankshafts, and cylinder heads under its own private label known as Four Star Engine & Parts (Four Star label) to certain warehouse distributors and to Ford-authorized dealers (Consolidated's Four Star label customers).  Consolidated's Four Star label customers sold the remanufactured automobile parts

that they had purchased from Consolidated to jobbers and garages who, in turn, sold such products at retail. (We shall refer collectively to Consolidated's Ford customers and Consolidated's Four Star label customers as customers.)

In addition, Consolidated served as a Ford-authorized distributor of Ford-authorized remanufactured automobile parts produced by other automobile parts remanufacturers, including clutch discs and pressure plates. Consolidated did not use any of the used and worn clutch discs and pressure plates that it obtained in its capacity as a Ford-authorized distributor to produce remanufactured clutch discs and pressure plates, but instead delivered those used and worn parts to the remanufacturers of those products.

The portion of a used and worn automobile part that is utilized to produce a remanufactured automobile part is known in the automobile parts remanufacturing industry as a core (core). In order to recondition and restore to salable condition a used and worn engine, transmission, cylinder head, crankshaft, or small automobile part, Consolidated needed a used and worn engine (engine core), transmission (transmission core), cylinder head (cylinder head core), crankshaft (crankshaft core), or small automobile part (small part core) to place into the remanufacturing process.

Consolidated's remanufacturing business depended on a supply of two materials: cores and new parts. It maintained inventories

of, inter alia, cores (unprocessed cores raw material inventory) and new parts (unprocessed new parts raw material inventory) upon which it drew throughout the remanufacturing process.

During Consolidated's remanufacturing process, Consolidated incurred expenditures for labor and overhead and transformed those raw materials into its finished goods or products (viz, remanufactured automobile parts). During that process for certain automobile parts, new parts were physically affixed to and incorporated into a core in order to produce a remanufactured automobile part. The new parts used by Consolidated in the remanufacturing process included pistons and rings, rockers and lifters, springs, bearings, chains, gears, plugs, pins, and other miscellaneous assembly parts. Consolidated purchased the new parts that it used in its remanufacturing business from the manufacturers of such parts.

Consolidated generally obtained cores from two sources. Consistent with customary and established practice in the automobile parts remanufacturing industry, Consolidated acquired most of its cores from its customers (customer cores), whose source for those cores was their respective customers.

Consolidated also acquired cores, except small part cores, from persons engaged in the business of selling cores and known in the automobile parts remanufacturing industry as core suppliers or core brokers (core suppliers). (We shall refer to the cores obtained from core suppliers as core supplier cores.)

Consolidated obtained core supplier cores only on a special order basis in order to satisfy a specific or temporary demand that had arisen for a particular remanufactured automobile part. Although there were hundreds of individuals and businesses operating as core suppliers, Consolidated purchased core supplier cores from six major core suppliers, one of which was Bishop Engine and Automatic, Inc. (Bishop Engine).

Bishop Engine was Consolidated's largest core supplier from which it purchased 44 percent and 38 percent of its core supplier cores during 1990 and 1991, respectively. Bishop Engine acquired 80 percent of the cores that it sold to automobile parts remanufacturers from salvage yards (salvage yard cores). Bishop Engine acquired the balance of such cores from individual peddlers and from manufacturers of automobile parts (e.g., General Motors, Ford, and Chrysler) which sold Bishop Engine automobile parts that had been returned to them pursuant to the warranties they had issued to their respective customers. Bishop Engine acquired approximately 20 percent of its salvage yard cores from bins that it placed in salvage yards in its local area and in which salvage yard employees placed cores (bin salvage yard cores). Bishop Engine acquired the balance of its salvage yard cores by sending its employees to salvage yards throughout the United States for the purpose of inspecting the cores in those yards and buying those cores that those employees believed were in rebuildable condition (non-bin salvage yard cores).

Bishop Engine determined the amounts that it was willing to pay for non-bin salvage yard cores and reflected those amounts in price sheets (price sheets) provided to its employees and distributed to salvage yards approximately every 3 months. Bishop Engine paid the same amounts for bin salvage yard cores that passed inspection at its place of business and for cores acquired from individual peddlers as those listed in the price sheets for the same types of cores. Bishop Engine adjusted those price sheets weekly as necessary to reflect any changing market conditions, such as an increase in prices due to increased demand from automobile parts remanufacturers and a decrease in prices, but in no event below scrap value, due to decreased demand from those remanufacturers. Bishop Engine distributed those weekly adjusted price sheets every Monday morning to its employees, who informed the salvage yard operators of changes in the price sheets. (We shall refer to the amounts that Bishop Engine paid for non-bin salvage yard cores and for bin salvage yard cores that passed inspection at its place of business as the salvage yard cost.) Bishop Engine paid scrap value for the bin salvage yard cores that did not pass inspection at its place of business and for the types of cores acquired from individual peddlers that were not listed on the price sheets.

Bishop Engine generally paid the cost of shipping the salvage yard cores that it had purchased to its place of business. At Bishop Engine's place of business, its employees

reinspected the non-bin salvage yard cores, inspected the bin salvage yard cores, and removed any unwanted components of such cores. As a result of the inspection process at Bishop Engine's place of business, Bishop Engine determined that 15 to 20 percent of the non-bin salvage yard cores and approximately 80 percent of the bin salvage yard cores which it had purchased were not in rebuildable condition. Bishop Engine sold the salvage yard cores that did not pass inspection at its place of business as scrap metal and offered the balance of its salvage yard cores that did pass such inspection for sale to, inter alia, automobile parts remanufacturers.

Bishop Engine determined the amounts to charge automobile parts remanufacturers for the various types of core supplier cores that it offered for sale to them by taking account of the amounts being charged by its competitors for those types of core supplier cores and market factors relating to supply and demand. Whenever Consolidated purchased core supplier cores from Bishop Engine, it paid the amounts that Bishop Engine was charging for those cores.

Bishop Engine and the other core suppliers from which Consolidated purchased core supplier cores guaranteed those cores to be in rebuildable condition (core supplier guarantee). If Consolidated discovered during the remanufacturing process that a core supplier core had to be scrapped because it was not in rebuildable condition, that core was removed from that process

and returned to the core supplier, and Consolidated received a credit from that core supplier for the amount that Consolidated had paid for that core. Approximately 3 percent of the cores sold by Bishop Engine to automobile parts remanufacturers were not in rebuildable condition and were subsequently returned by them to Bishop Engine in return for which they received such credits.

Core supplier cores purchased by Consolidated entered into its production line almost immediately upon acquisition and remained in its unprocessed cores raw material inventory for only a brief period of time. As a consequence, that inventory consisted almost entirely of customer cores, and not core supplier cores.

By way of illustration of the remanufacturing process by which Consolidated produced reconditioned engines in salable condition, engine customer cores were torn down, stored in its unprocessed cores raw material inventory, and subsequently placed into production. If a customer had delivered to Consolidated a short-block engine customer core, which was an engine customer core without the heads, Consolidated's employees cleaned off the casting number, consulted the identification manual to determine the engine type and core lot number, wrote the core lot number on the top of that core, and wheeled it into the yard (core yard) where Consolidated stored its unprocessed cores raw material inventory. If a customer had delivered to Consolidated a long-

block engine customer core, which was a short-block customer core with the heads, that core underwent some initial disassembly by Consolidated's employees in order to convert it into a short-block engine customer core (i.e., the cylinder heads, related valve train assembly, and the oil pump were removed), at which point it was marked and wheeled into the core yard. Short-block engine customer cores that were not sufficiently stripped down so as to permit detection of irreparable latent defects remained in the core yard until they were brought into production, at which time they were further disassembled, inspected for defects, and reconditioned into salable condition. During the disassembly and cleaning process, engine customer cores and engine core supplier cores were subjected to numerous visual and mechanical examinations and procedures. Only if an engine core passed all of those examinations and procedures could it become a remanufactured automobile engine.

During the disassembly process, the cylinder heads, the crankshaft, the camshaft, and rods were removed from the engine core, retained by Consolidated, and subjected to separate remanufacturing processes. These parts were, if in usable condition, remanufactured in separate areas of Consolidated's remanufacturing facility. Those remanufactured automobile parts were then incorporated into remanufactured engines and, in the case of crankshafts, heads, and rods, were sold as separate remanufactured automobile parts.

The following tables show the number of remanufactured automobile parts produced by Consolidated, the number of such remanufactured automobile parts produced from customer cores, and the number of such remanufactured automobile parts produced from core supplier cores:

| Type of Automobile Part | 1990 | | |
| | Total Production | Total Production From Customer Cores | Total Production From Core Supplier Cores |
| --- | --- | --- | --- |
| Engines | 26,864 | 20,407 | 6,457 |
| Transmissions | 1,549 | 1,220 | 329 |
| Crankshafts | 22,029 | 18,004 | 4,025 |
| Cylinder heads | 39,365 | 30,011 | 9,354 |
| Small parts | 103,537 | 103,537 | -0- |

| Type of Automobile Part | 1991 | | |
| | Total Production | Total Production From Customer Cores | Total Production From Core Supplier Cores |
| --- | --- | --- | --- |
| Engines | 21,360 | 15,559 | 5,801 |
| Transmissions | 1,818 | 1,326 | 492 |
| Crankshafts | 19,942 | 16,211 | 3,731 |
| Cylinder heads | 34,785 | 25,047 | 9,738 |
| Small parts | 91,286 | 91,286 | -0- |

Consolidated's Sale of Remanufactured
Automobile Parts and Acquisition of Customer Cores

Consistent with standard and customary practice in the automobile parts remanufacturing industry, Consolidated sold each remanufactured automobile part for, and each of its customers was obligated to pay, an amount (remanufactured automobile part sales price) that consisted of an exchange amount and a core amount. The remanufactured automobile part sales price was determined by

market-related factors, including supply and demand. The exchange amount, the core amount, and the total of those two amounts (i.e., the remanufactured automobile part sales price) for each remanufactured automobile part sold by Consolidated were separately stated on each of Consolidated's sales invoices for each such sale (remanufactured automobile part sales invoice).

Each automobile parts remanufacturer established its own remanufactured automobile part sales price consisting of an exchange amount and a core amount. Consolidated determined the exchange amount that it charged as part of its remanufactured automobile part sales price based on market-related factors. In making that determination, Consolidated, inter alia, examined the jobber price exchange amounts for remanufactured automobile parts (i.e., the exchange amounts that automobile retail parts stores determined should be part of the total prices charged their respective customers for remanufactured automobile parts) that were produced by those competitors of Consolidated which were comparable to it in terms of, inter alia, quality of products and service and warranty policy.

The core amount included as part of the remanufactured automobile part sales price charged for any given remanufactured automobile part varied among remanufacturers. Consolidated determined that core amount based on several market-related factors, including the supply and demand of customer cores. One such factor was the location of the customer core within its

anticipated life cycle as conceptualized by Consolidated. Consolidated viewed the life cycle of a core as consisting of three phases. Throughout the first phase of that cycle during which new automobile parts were being introduced into the market, customer cores were scarce; Consolidated might have purchased those parts from manufacturers and cores from core suppliers in order to have cores from which it was able to produce an inventory of finished goods; and Consolidated's core amounts generally were increasing. Throughout the second phase of the life cycle of a core as conceptualized by Consolidated, customer core availability increased; Consolidated's inventory need for customer cores was satisfied through transactions with its customers and on a special order basis from core suppliers; and Consolidated's core amounts leveled out and remained relatively constant. Throughout the third phase of that life cycle, customer core availability was at its maximum; Consolidated regularly sold as scrap metal overstocked customer cores in its unprocessed cores raw material inventory; and Consolidated's core amounts ordinarily were decreasing.

Other market-related factors that Consolidated considered in determining the core amount which was part of the remanufactured automobile part sales price that it charged a customer for a remanufactured automobile part included the supply of a particular type of customer core in Consolidated's inventories, the probability that its customers would decide to provide it

with customer cores, the ratio between sales of a particular type of remanufactured automobile part and acquisitions of the corresponding type of customer core, and the amounts that core suppliers were charging for certain types of core supplier cores that Consolidated anticipated purchasing in order to satisfy a specific or temporary demand for particular types of automobile parts.

At the time Consolidated sold each remanufactured automobile part to each of its customers, it offered to purchase from each such customer, subject to the requirements established by Consolidated for its acceptance of a customer core (Consolidated's requirements for acceptance of a customer core), a customer core of the same type as each such part sold. Consolidated offered to purchase each such customer core for an amount (customer core purchase offer amount) that generally was equal to the core amount which was separately stated on the remanufactured automobile part sales invoice as part of the remanufactured automobile part sales price for each such part. The customer core purchase offer amount was, like the core amount, based on market-related factors, including supply and demand. The customer core purchase offer amount could have been less than the core amount shown on the remanufactured automobile part sales invoice. That could have occurred because of the condition of the customer core upon its delivery to Consolidated. For example, Consolidated's customer core purchase offer amount

for an engine core with a hole in it was equal to 50 percent of the core amount which was separately stated on the remanufactured automobile part sales invoice as part of the remanufactured automobile part sales price for a corresponding remanufactured automobile engine. The customer core purchase offer amount for each customer core was set at an amount that the marketplace in which Consolidated acquired customer cores demanded.

At no time were Consolidated's customers under any obligation to accept Consolidated's offer to purchase customer cores from them or otherwise to provide such cores to Consolidated. However, most of those customers did decide to accept Consolidated's offer and provided it with customer cores. In the event that a customer of Consolidated decided to accept Consolidated's offer to purchase a customer core and that customer met Consolidated's requirements for acceptance of a customer core, instead of that customer's receiving a check or cash from Consolidated in the customer core purchase offer amount for that customer core, that customer became entitled to a credit by Consolidated in that amount (core credit amount) against the amount which was due from that customer (viz, the remanufactured automobile part sales price) for such customer's purchase of a remanufactured automobile part from Consolidated and which was reflected in Consolidated's books as an account receivable from that customer. (We shall refer to such an account receivable in Consolidated's books as the customer account receivable.) Like

the customer core purchase offer amount on which it was based, the core credit amount generally was equal to the core amount and was based on market-related factors, including the supply and demand of customer cores, although, as discussed above, the customer core purchase offer amount and therefore the core credit amount could have been in an amount less than the core amount because of the condition of the customer core upon its delivery to Consolidated. The core credit amount for each customer core was set at an amount that the marketplace in which Consolidated acquired customer cores demanded.

Consolidated's customers did not guarantee the cores that they decided to provide to it. However, Consolidated's requirements for acceptance of a customer core had to be satisfied before Consolidated was willing to accept a customer core. Those requirements were: (1) The customer desiring to deliver the customer core had purchased a remanufactured automobile part from Consolidated; (2) the remanufactured automobile part sales price charged for that part included a core amount; (3) the customer core satisfied Consolidated's customer core policy (Consolidated's customer core policy) relating to, inter alia, the type and condition of the core that Consolidated was willing to accept (e.g., Consolidated's customer core policy for Four Star label cylinder head cores stated that those cores were not acceptable if they were "obviously broken, cracked, or welded"); and (4) the customer followed Consolidated's procedures

for delivery of a customer core to Consolidated (Consolidated's procedures for delivery of a customer core).

The following table shows the aggregate number of the different types of Ford-authorized and Four Star label remanufactured automobile parts sold by Consolidated and the aggregate number of the different types of corresponding Ford-authorized and Four Star label customer cores that Consolidated's customers decided to provide to Consolidated and that were delivered to it:

| | 1990 | | 1991 | |
|---|---|---|---|---|
| Type of Remanufactured Automobile Part Sold | Aggregate Number of Remanufactured Automobile Parts Sold | Aggregate Number of Customer Cores Delivered | Aggregate Number of Remanufactured Automobile Parts Sold | Aggregate Number of Customer Cores Delivered |
| Engines | 26,677 | 24,391 | 22,130 | 20,534 |
| Transmissions | 1,572 | 1,365 | 1,793 | 1,505 |
| Crankshafts | 24,050 | 23,425 | 19,658 | 19,088 |
| Cylinder heads | 6,928 | 5,188 | 7,172 | 5,603 |
| Small parts | 90,128 | 75,450 | 89,040 | 76,356 |

In anticipation that Consolidated's customers would decide to accept its offer to purchase and deliver customer cores to it, even though they were under no obligation to do so, Consolidated provided each of those customers with a form known as a request for core credit at the time that it delivered to them the remanufactured automobile parts that they had purchased. The request for core credit was a preprinted form generally con-sisting of three copies: One for Consolidated's customer, a transportation copy, and a copy that was to be returned to Consolidated in the event and at the time that a customer

delivered customer cores to it.  In the case of Four Star label remanufactured engines, the request for core credit preprinted form consisted of the foregoing three copies and a fourth copy for the person, usually a jobber, who purchased such an engine from Consolidated's customer.

Consolidated's customer core policy established a period of time during which any of its customers who decided to provide it with customer cores was required to deliver such cores (delivery period).  That period commenced on the date of the installation of the remanufactured automobile part sold by Consolidated.  The delivery period varied depending on the type of customer core from 30 days for Consolidated's Four Star label customer crankshafts to 2 years for Consolidated's Ford customer small automobile parts.  Despite Consolidated's policy regarding the delivery period, Consolidated accepted customer cores from its customers after that period had expired, even if those cores were determined not to be in rebuildable condition, and credited each customer account receivable with the core credit amounts. Consolidated followed this practice regardless whether the customer cores provided by its customers after the delivery period had become overstocked or obsolete due to the passage of time or whether the core amounts that were part of the remanufactured automobile parts sales prices that those customers were charged had changed.

Consolidated's procedures for delivery of a customer core were:  (1) The customer presented the transportation copy of the request for core credit to the person who picked up the core from the customer's place of business and who usually was an employee of Consolidated making a delivery of remanufactured automobile parts to that customer (Consolidated's driver); (2) a copy of the request for core credit was physically tagged to the customer core that Consolidated's driver picked up from that customer; and (3) Consolidated's driver made a visual inspection of that core and, based solely on that inspection, determined whether the customer was in compliance with Consolidated's customer core policy, including the requirements, if any, in that policy that the type and style of the customer core delivered to Consolidated correspond to the type and style of the remanufactured automobile part purchased by that customer.

In addition to accepting customer cores from its customers that corresponded to the remanufactured automobile parts that those customers had purchased from Consolidated, Consolidated also accepted delivery from those customers of customer cores that did not correspond to those parts.  In the latter event, for each such customer Consolidated credited the customer account receivable in an amount that was less than the core amount which was part of the remanufactured automobile part sales price for each of the remanufactured automobile parts purchased by that customer.

In the event that one of Consolidated's customers decided to accept its offer to purchase and delivered customer cores to it, Consolidated generated and provided to each such customer a sales invoice (customer core sales invoice) at or about the time of the delivery of those cores. That invoice was prepared from information in a file that Consolidated maintained for each of its customers with respect to sales to each such customer of its remanufactured automobile parts. The customer core sales invoice, inter alia, identified the type and the number of customer cores of each type that each of Consolidated's customers delivered to it. That invoice also had, inter alia, a column headed "CORES", and under that column was, inter alia, a column headed "PRICE EACH". Listed under the column headed "PRICE EACH" on the customer core sales invoice was the core credit amount for each of the customer cores identified on that invoice as having been delivered to Consolidated. (We shall refer to the column on the customer core sales invoice reflecting the price of each customer core that a customer decided to deliver to Consolidated as the column headed "Cores--Price Each".) Attached to each customer core sales invoice was a completed copy of a request for core credit and a document generated by Consolidated's customer showing the date on which such customer received from such customer's customer the core that it decided to deliver to Consolidated.

A customer core could have remained in Consolidated's unprocessed cores raw material inventory for months or years before Consolidated drew upon it for use in Consolidated's remanufacturing process. When demand for a type of remanufactured automobile part was sufficiently limited (e.g., if the vehicle for which such a type of part was to be used was an obsolete, early model vehicle), the customer core corresponding to that type of remanufactured automobile part might have been put out for bid as scrap metal and sold by Consolidated at scrap metal prices without ever having entered into production.

The following percentages of customer cores that were delivered to Consolidated and that entered into its remanufacturing process were subsequently determined not to be in rebuildable condition and were scrapped:

| Type of Customer Core | 1990 Percentage of Customer Cores Not in Rebuildable Condition | 1991 Percentage of Customer Cores Not in Rebuildable Condition |
| --- | --- | --- |
| Engine cores | 16.44 | 18.45 |
| Transmission cores | 14.34 | 23.38 |
| Crankshaft cores | 37.97 | 37.59 |
| Cylinder head cores | 19.00 | 26.13 |
| Small part cores | 10.06 | 6.46 |

Consolidated's Accounting

Consolidated used the calendar year and the accrual and inventory methods of accounting for financial and Federal income tax (tax) reporting purposes. Until the close of its taxable year 1980, Consolidated reported its inventories (at least for

tax purposes) by using the FIFO method of inventory accounting, and it chose to apply the LCM basis of valuation.

Consolidated submitted Form 970, Application to Use LIFO Inventory Method, with its 1980 tax return (1980 Form 970). As completed by Consolidated, the 1980 Form 970 stated in pertinent part:

> The taxpayer named above [Consolidated] hereby applies to adopt and use the LIFO inventory method provided by section 472. This method is to be applied for the first time as of the close of the taxable year ending December 31, 1980, to the following specified goods * * *: Reconditioning costs[3] and new parts inventories, not including the cost of used core inventory.
>
>     *    *    *    *    *    *    *
>
> 4. (a) List goods subject to inventory but which are not to be inventoried under the LIFO method
>     Used engines and parts (cores).
>
>     *    *    *    *    *    *    *
>
> 7. Method used in valuing LIFO inventories
>   ☐ Unit method    ☒ Dollar-value method
>
> 8. (a) If pools are used, list and describe the contents of each pool
>     One pool consisting of raw material, purchased parts and remanufacturing costs.
>
>     *    *    *    *    *    *    *
>
>   (c) Method used in computing LIFO value of dollar-value pools

---

[3] As we understand it, the term "reconditioning costs" as used in the 1980 Form 970 means the costs of direct labor and of overhead incident to and necessary for the production of remanufactured automobile parts that Consolidated incurred in remanufacturing those parts. We shall refer to Consolidated's reconditioning costs as labor and overhead.

* * * * * * *

> The index method has been used by the company
> in computing the value of the dollar value
> pool. * * *

(We shall refer to the LIFO inventory method that Consolidated elected in the 1980 Form 970 as Consolidated's LIFO method.) Consolidated submitted another Form 970 with its 1982 tax return (1982 Form 970). As completed by Consolidated and as pertinent here, the 1982 Form 970 differed from the 1980 Form 970 only with respect to the following questions and answers:

> 8. (a) If you use pools, list and describe contents of
> each pool[:]  Two pools are used; motor vehicle parts;
> and machine shop products.  Pools include raw material,
> purchased parts and remanufacturing costs.

> * * * * * * *

> (c) Method used in computing LIFO value of dollar-
> value pools

> * * * * * * *

> Simplified LIFO per Reg. Sec. 1.472-8(e)(3) [i.e.,
> inventory price index (IPI) computation method]

> * * * * * * *

> Taxpayer initially elected LIFO for the tax year ending
> December 31, 1980.  Form 970 was timely filed for such
> election and the taxpayer consistently followed such
> dollar value method.  However, due to changes made by
> the Economic Recovery Tax Act of 1981, which allows a
> change to the use of published indexes, taxpayer hereby
> elects to compute LIFO inventories by using such
> Government published indexes as prescribed in Reg.
> 1.472-8(e)(3).  Per Reg. 1.472-8(e)(3)(v), prior
> consent of the Commissioner is not required if the
> change is made for the first or second taxable year
> ending after 1981.

> * * * * * * *

Taxpayer elects to use the October Producer Price Index report as a representative month for selecting indexes. Such election is allowed under Reg. 1.472-8(e)(3)(iii)(C).

Except for the IPI computation method that Consolidated elected to use in the 1982 Form 970 in calculating its dollar-value LIFO pools since the end of its taxable year 1982, Consolidated has consistently applied Consolidated's LIFO method (i.e., the LIFO inventory method described in the 1980 Form 970) during all relevant periods.

At the time of a sale of remanufactured automobile parts to one of its customers, for each such part, Consolidated made an entry increasing (1) its "sales (exchange amount)" by the exchange amount that was part of the remanufactured automobile part sales price, (2) its "sales (core amount)" by the core amount that was the remaining part of that sales price, and (3) its "customer account receivable" by the remanufactured automobile sales price (i.e., the sum of those two amounts). At the time at which that customer decided to and did deliver customer cores to Consolidated, for each such core, Consolidated made an entry decreasing its "sales (core amount)" and its "customer account receivable" by the core credit amount.

At the time Consolidated purchased a core supplier core, it charged the cost of that core directly to cost of goods sold.

Deloitte & Touche and Pierce, Faris & Co., Chartered audited Consolidated's 1990 financial statements and 1991 financial

statements, respectively, and issued unqualified opinions that those respective financial statements presented fairly, in all material respects, the financial position of Consolidated and the results of its operations and cash flows for 1990 and 1991 in conformity with generally accepted accounting principles (GAAP).

For financial reporting purposes, Consolidated calculated its inventories by using LCM and (1) the LIFO method for new parts, labor, and overhead and (2) the FIFO method for customer cores. For such purposes, Consolidated reflected customer cores in its inventories at the amounts (core supplier amounts) that core suppliers were charging for similar types of core supplier cores.

For tax purposes, in determining its yearend inventories, Consolidated included (1) customer cores in its finished goods inventory at the core supplier amounts and (2) customer cores in its unprocessed cores raw material inventory and its goods in process inventory at scrap value (Consolidated's FIFO-LCM method).

For purposes of this case, both cores and new parts used by Consolidated to produce remanufactured automobile parts are treated as raw materials under GAAP and subchapter E, chapter 1, subtitle A of the Code relating to accounting periods and methods of accounting, and they shall be referred to herein as raw materials.

Respondent's Determinations

Respondent mailed notices of final S corporation administrative adjustment (notices) for 1990 and 1991, respectively, to Merl Philip Long, grantor and trustee of the M.P. Long Living Trust, the tax matters person.  Respondent determined in the notices that Consolidated improperly excluded customer cores from the calculation of its inventories under Consolidated's LIFO method for each of those years and that, consequently, Consolidated's LIFO election should be terminated. Respondent also determined in the notices that Consolidated did not reflect the proper amounts for customer cores in its inventories under Consolidated's FIFO-LCM method for each of those years.[4]

## OPINION

This case presents several inventory accounting issues that implicate sections 446, 471, and 472.  Section 446 provides in pertinent part:

> (a) General Rule.--Taxable income shall be computed under the method of accounting on the basis of which the taxpayer regularly computes his income in keeping his books.

> (b) Exceptions.--If no method of accounting has been regularly used by the taxpayer, or if the method used does not clearly reflect income, the computation of taxable income shall be made under such method as, in the opinion of the Secretary, does clearly reflect income.

---

[4]  Petitioner conceded the remaining determination in the notice for 1990.

Section 471(a) provides:

> (a) General Rule.--Whenever in the opinion of the Secretary the use of inventories is necessary in order clearly to determine the income of any taxpayer, inventories shall be taken by such taxpayer on such basis as the Secretary may prescribe as conforming as nearly as may be to the best accounting practice in the trade or business and as most clearly reflecting the income.

Section 1.471-2(c) and (d), Income Tax Regs., provides in

pertinent part:

> (c) The bases of valuation most commonly used by business concerns and which meet the requirements of section 471 are (1) cost and (2) cost or market, whichever is lower. * * *

> (d) * * * Goods taken in the inventory which have been so intermingled that they cannot be identified with specific invoices will be deemed to be the goods most recently purchased or produced * * *.  But see section 472 as to last-in, first-out inventories. * * *

Section 472(a) and (b) provides:

> (a) Authorization.--A taxpayer may use the method provided in subsection (b) (whether or not such method has been prescribed under section 471) in inventorying goods specified in an application to use such method filed at such time and in such manner as the Secretary may prescribe.  The change to, and the use of, such method shall be in accordance with such regulations as the Secretary may prescribe as necessary in order that the use of such method may clearly reflect income.

> (b) Method Applicable.--In inventorying goods specified in the application described in subsection (a), the taxpayer shall:

>> (1) Treat those remaining on hand at the close of the taxable year as being: First, those included in the opening inventory of the taxable year (in the order of acquisition) to the extent thereof; and second, those acquired in the taxable year;

(2) Inventory them at cost; and

(3) Treat those included in the opening inventory of the taxable year in which such method is first used as having been acquired at the same time and determine their cost by the average cost method.

Sections 446 and 471 and the regulations thereunder vest the Commissioner of Internal Revenue (Commissioner) with wide discretion in determining whether a method of inventory accounting should be disallowed because it does not clearly reflect income. Thor Power Tool Co. v. Commissioner, 439 U.S. 522, 532-533 (1979); Hamilton Indus., Inc. v. Commissioner, 97 T.C. 120, 128 (1991). The Commissioner's interpretation of the clear-reflection standard under sections 446 and 471 may not be disturbed unless it is clearly unlawful or plainly arbitrary. Thor Power Tool Co. v. Commissioner, supra; Hamilton Indus., Inc. v. Commissioner, supra at 129. The Commissioner's discretion under sections 446 and 471 is not unbridled, however. Thor Power Tool Co. v. Commissioner, supra at 533; Hamilton Indus., Inc. v. Commissioner, supra at 128. We must decide whether respondent abused respondent's discretion in determining (1)(a) that Consolidated's LIFO method for 1990 and 1991 does not clearly reflect income because that method pertained only to new parts, labor, and overhead, and not also to customer cores, and (b) that therefore Consolidated's election to use that method should be terminated and (2) that Consolidated's FIFO-LCM method for the

years at issue does not clearly reflect income because that method did not reflect the proper amounts for customer cores.[5]

Before turning to the issues presented in this case, we note that we have given due consideration to all of the parties' arguments and contentions with respect to those issues, even though we do not attempt to address each of them herein.

Consolidated's LIFO Method

For all relevant periods until the close of its taxable year 1980, Consolidated chose to report its inventories in its tax returns on the basis of the FIFO inventory method and LCM. In the 1980 Form 970 that it filed, Consolidated elected to apply the LIFO inventory method as of the close of its taxable year 1980 to "Reconditioning costs and new parts inventories, not including the cost of used core inventory" and to use the dollar-value LIFO inventory method.[6] In the 1982 Form 970 that it

_____

[5] Respondent does not object to Consolidated's method of accounting for core supplier cores. We shall address only Consolidated's inventory method of accounting for customer cores.

[6] Sec. 1.472-8(a), Income Tax Regs., provides in pertinent part:

Any taxpayer may elect to determine the cost of his LIFO inventories under the so-called "dollar-value" LIFO method, provided such method is used consistently and clearly reflects the income of the taxpayer in accordance with the rules of this section. The dollar-value method of valuing LIFO inventories is a method of determining cost by using "base-year" cost expressed in terms of total dollars rather than the quantity and price of specific goods as the unit of measurement. Under such method the goods contained in the inventory
(continued...)

filed, Consolidated elected under section 472 to apply as of the close of its taxable year 1982 the IPI computation method in calculating its dollar-value LIFO pools.  Pursuant to that method, Consolidated elected to use the October Producer Price Index report as allowed by section 1.472-8(e)(3)(iii)(C), Income Tax Regs.

Petitioner contends, and respondent does not dispute, (1) that Consolidated's LIFO method conforms to GAAP and that it therefore satisfies the requirement of section 471 and the regulations thereunder that that method conform "as nearly as may be to the best accounting practice in the trade or business" and (2) that Consolidated has consistently applied that method.  The dispute between the parties with respect to Consolidated's LIFO method is whether respondent abused respondent's discretion in determining that that method does not clearly reflect income because it contravenes the requirements of section 472 and the regulations thereunder and that, consequently, Consolidated's election to use that method should be terminated.

We shall begin our consideration of the parties' dispute by summarizing the history of the inventory method of tax

(...continued)
    are grouped into a pool or pools as described in para-
    graphs (b) and (c) of this section.  The term "base-
    year cost" is the aggregate of the cost (determined as
    of the beginning of the taxable year for which the LIFO
    method is first adopted, i.e., the base date) of all
    items in a pool. * * *

accounting, the FIFO inventory method, and the LIFO inventory method.  The use of inventories was first required by the Revenue Act of 1918 (1918 Act), ch. 18, sec. 203, 40 Stat. 1060, whenever, in the opinion of the Commissioner, such use was necessary in order to determine clearly the income of any taxpayer.[7]  Where goods taken in inventory were so intermingled that they could not be identified with specific invoices, Article 1582 of Regulations 45, promulgated under the 1918 Act, deemed such goods to be the goods most recently purchased or produced. In other words, in such circumstances, taxpayers were to use the FIFO inventory method as a matter of convenience.[8]  See Ozark Mills, Inc. v. Commissioner, 6 B.T.A. 1179, 1183-1184 (1927).

It was not until the Revenue Act of 1938 (1938 Act), ch. 289, 52 Stat. 447, that Congress first allowed certain taxpayers (viz, producers and processors of certain nonferrous metals and tanners) who were required to use the inventory accounting method to elect the LIFO inventory method for certain goods included in their inventories.  1938 Act, sec. 22(d)(1) through (3), 52 Stat. 459.  Effective for taxable years that began after December 31, 1938, producers and processors of certain nonferrous metals

_____

[7]  Sec. 203 of the Revenue Act of 1918, ch. 18, sec. 203, 40 Stat. 1060, was the original predecessor of sec. 471.

[8]  The FIFO inventory method is expressly permitted by sec. 1.471-2(d), Income Tax Regs., when goods taken in inventory are so intermingled that they cannot be identified with specific invoices.

generally were permitted to elect the LIFO inventory method for raw materials not yet included in goods in process or in finished goods, i.e., for unprocessed raw materials, 1938 Act, sec. 22(d)(1) and (2), 52 Stat. 459, and tanners generally were allowed to elect the LIFO inventory method for "raw materials (including those included in goods in process and in finished goods)", 1938 Act, sec. 22(d)(3), 52 Stat. 459. Section 22(d)(1) through (3) of the 1938 Act was reenacted as section 22(d)(1) through (3) of the 1939 Code. 1939 Code, ch. 2, sec. 22(d)(1) through (3), 53 Stat. 11.

Congress amended section 22(d) of the 1939 Code, effective for taxable years that began after December 31, 1938, to provide in pertinent part:

(d)(1) A taxpayer may use the following method * * * in inventorying the goods specified in the application required under paragraph (2):

(A) Inventory them at cost;

(B) Treat those remaining on hand at the close of the taxable year as being: First, those included in the opening inventory of the taxable year (in the order of acquisition) to the extent thereof, and second, those acquired in the taxable year; and

(C) Treat those included in the opening inventory of the taxable year in which such method is first used as having been acquired at the same time and determine their cost by the average cost method.

(2) The method described in paragraph (1) may be used--

> (A)  Only in inventorying goods * * *
> specified in an application to use such meth-
> od filed at such time and in such manner as
> the Commissioner may prescribe * * *

> \*   \*   \*   \*   \*   \*   \*

> (3) The change to, and the use of, such method
> shall be in accordance with such regulations as the
> Commissioner, with the approval of the Secretary, may
> prescribe as necessary in order that the use of such
> method may clearly reflect income.

Revenue Act of 1939 (1939 Act), ch. 247, sec. 219, 53 Stat. 877.

(We shall refer to section 22(d) of the 1939 Code as amended by

section 219 of the 1939 Act as section 22(d) of the 1939 Code as

amended.)

The regulations promulgated under section 22(d) of the 1939

Code as amended provided in pertinent part:

> Sec. 19.22(d)-1. Inventories under elective
> method.--Any taxpayer permitted or required to take
> inventories * * * may elect with respect to those goods
> specified in his application and properly subject to
> inventory to compute his opening and closing
> inventories in accordance with the method provided by
> section 22(d), as amended. * * *

> \*   \*   \*   \*   \*   \*   \*

> Sec. 19.22(d)-2. Requirements incident to adoption
> and use of elective method.--* * *

> > (1) The taxpayer shall file an
> > application to use such method specifying
> > with particularity the goods to which it is
> > to be applied;

Secs. 19.22(d)-1 and -2, Regs. 103.  In 1943, sections 19.22(d)-1

and -2 of Regulations 103 were repromulgated with changes not

pertinent here as sections 29.22(d)-1 and -2 of Regulations 111.

In 1944, section 29.22(d)-1 of Regulations 111 was amended to add in pertinent part the following language:

> A manufacturer or processor who has adopted the elective [LIFO] inventory method as to a class of goods may elect to have such method apply to the raw materials only (including those included in goods in process and in finished goods) expressed in terms of appropriate units. * * *

>     *     *     *     *     *     *     *

> This election may also apply to any one raw material, when two or more raw materials enter into the composition of the finished product * * *

9 Fed. Reg. 12336, 12337 (Oct. 11, 1944). (We shall refer to the amendment in 1944 to section 29.22(d)-1 of Regulations 111 as the 1944 amendment to section 29.22(d)-1 of Regulations 111.)

Section 22(d)(1) through (3) of the 1939 Code as amended was reenacted with changes not pertinent here as section 472(a) and (b) of the 1954 Code, ch. 736, sec. 472(a) and (b), 68A Stat. 159, and the latter section was reenacted with no changes as section 472(a) and (b) of the 1986 Code, see Tax Reform Act of 1986, Pub. L. 99-514, sec. 2, 100 Stat. 2095. Sections 29.22(d)-1 and -2 of Regulations 111, including the 1944 amendment to section 29.22(d)-1 of Regulations 111, were repromulgated with changes not pertinent here as regulations under section 472.

With this history as background, we shall address the disagreement between the parties over whether Consolidated's LIFO method contravenes the requirements of section 472 and the regulations thereunder and therefore does not clearly reflect

income.  Consolidated's remanufacturing business depended on a
supply of two raw materials: cores and new parts.  During the
remanufacturing process, Consolidated incurred expenditures for
labor and overhead and transformed those raw materials into its
finished goods or products (viz, remanufactured automobile
parts).  Thus, cores, new parts, labor, and overhead all entered
into the production of those finished goods or products.
Pursuant to section 1.471-1, Income Tax Regs., Consolidated
maintained inventories for each of the two unprocessed raw
materials that it used in its remanufacturing business, for
partly finished goods, i.e., goods in process of remanufacture
(goods in process), and for finished remanufactured goods
(finished goods).[9]  Virtually all of the cores included in
Consolidated's inventories were, and we shall hereinafter refer
to them as, customer cores.  See supra note 5.

Consolidated elected in the 1980 Form 970 to use the LIFO
inventory method with respect to new parts, labor, and overhead,
but not customer cores.  Thus, under Consolidated's LIFO method,
Consolidated used (1) the LIFO inventory method for (a) new parts
that were included in its inventories for unprocessed new parts,

---

[9]  Although it is not altogether clear from the record, it
appears that Consolidated maintained separate unprocessed new
parts raw material inventories, unprocessed cores raw material
inventories, goods in process inventories, and finished goods
inventories in respect of the different types (e.g.,
remanufactured automobile engines) of goods or products that it
produced (viz, remanufactured automobile parts).

for goods in process, and for finished goods and (b) labor and overhead that were included in Consolidated's inventories for goods in process and for finished goods and (2) the FIFO inventory method for customer cores that were included in its inventories for unprocessed customer cores, for goods in process, and for finished goods.

Respondent contends that section 472 and the regulations thereunder require a taxpayer who wants to elect the LIFO inventory method (1) to make that election with respect to a good or goods subject to inventory and specified in the application prescribed by the Secretary of the Treasury (Secretary) for electing that method (viz, Form 970) and (2) to make that election with respect to such entire good or goods and not a portion thereof.[10]  According to respondent,

> It is critical to note that the statute and the regulations specify that the election is to be made as to "goods".  The goods produced by Consolidated are remanufactured automobile parts, such as remanufactured engines.  Under the general rule, if Consolidated elected LIFO as to remanufactured automobile engines, the LIFO election would apply to raw materials, i.e. cores and new parts, and the reconditioning costs, i.e. labor and overhead.  However, Consolidated elected as to only a portion of each type of good by excluding cores.  * * * For each type of goods, such as remanufactured engines, this left a portion of the

---

[10]  Respondent concedes that a taxpayer may elect the LIFO inventory method with respect to a type or class of goods, such as remanufactured automobile engines, but contends that that election must be as to the "entire good", and not a portion of a good, within a type or class of goods.  For convenience, generally we shall refer only to a good or goods, and not to a type or class of goods.

goods (new parts and reconditioning costs) on LIFO, and a portion of the goods (cores) on FIFO.

A permissible variance to the inclusion of the total goods in LIFO is provided by Treas. Reg. § 1.472-1(c) which allows the LIFO election to be restricted to raw materials. * * *

* * * * * * *

* * * Consolidated has fashioned a method of accounting that factors out inflationary price increases for part of a particular good (labor, overhead and a secondary raw material--new parts) and takes into account inflation and changes in market value for the remaining portion of the goods (the principal raw material--the core). This is inconsistent with the plain language of § 472 and the purpose of the LIFO method. A taxpayer must decide in toto for a type or class of goods whether it will use either the LIFO method to currently deduct inflationary price increases or the LCM method to currently deduct decreases in the market value of production costs. A taxpayer is not permitted to use a hybrid of these two methods for a single type or class of goods.

In support of respondent's position, respondent points, inter alia, to section 472(a) and section 1.472-1(a), Income Tax Regs. Section 472(a) provides in pertinent part: "A taxpayer may use the [LIFO inventory] method * * * in inventorying goods specified in an application to use such method". Section 1.472-1(a), Income Tax Regs., elaborates on section 472(a), in pertinent part, as follows:

Any taxpayer permitted or required to take inventories pursuant to the provisions of section 471, and pursuant to the provisions of §§ 1.471-1 to 1.471-9, inclusive, may elect with respect to those goods specified in his application and properly subject to inventory to compute his opening and closing inventories in accordance with the method provided by section 472, this section, and § 1.472-2. * * *

Petitioner concedes in its opening brief that "Section 472 and the Regulations promulgated thereunder are worded in terms of electing to value "goods" under the LIFO method".  However, according to petitioner:

> Treasury Regulation Section 1.471-3(c) is clear that the "cost" of finished and partly finished goods consist [sic] of the "cost" of raw materials, labor and overhead. * * * Thus, * * * the finished and partly finished goods included in such an [LIFO] election necessarily consist of the cost attributable to raw materials, labor, and overhead.

Petitioner elaborates on the foregoing argument in its answering brief, as follows:

> Treasury Regulation Section 1.472-1 provides that "[a]ny taxpayer permitted or required to take inventories pursuant to the provisions of section 471, and pursuant to the provisions of §§ 1.471-1 to 1.471-9, inclusive, may elect with respect to those goods specified in his application and properly subject to inventories to compute his opening and closing inventories in accordance with" the LIFO method. Treas. Reg. §1.472-1(a).  The cost of raw materials, the cost of labor, and the cost of overhead are expressly identified as inventoriable costs in Treasury Regulation Section 1.471-3(c).  Hence, such costs are included within the specified provisions identified in Treasury Regulation Section 1.472-1(a) for which the LIFO inventory method is expressly made available. Respondent may not, therefore, deny Petitioner's right to elect the LIFO method for labor and overhead costs or condition its right to make such an election on electing LIFO for the "good" produced by such labor and overhead.

We agree with respondent.  We find petitioner's interpretation of sections 1.471-3(c) and 1.472-1(a), Income Tax Regs., on which it relies to be strained, and its reliance on

those regulations to be misplaced.[11]  The latter regulation,

section 1.472-1(a), Income Tax Regs., merely provides that a

taxpayer who is allowed or required to use the inventory

accounting method as provided by section 471 and the regulations

thereunder may elect the LIFO inventory method under section 472,

but only "with respect to those goods specified in his

application and properly subject to inventory".  The cross-

reference in section 1.472-1(a), Income Tax Regs., to all the

regulations promulgated under section 471, including section

1.471-3(c), Income Tax Regs., that were extant when section

1.472-1(a), Income Tax Regs., was promulgated is of no relevance,

let alone significance, in deciding whether section 472(a) and

the regulations thereunder mean what they say when they permit a

taxpayer to elect the LIFO inventory method in inventorying goods

specified in an application filed by such taxpayer.

The former regulation, section 1.471-3(c), Income Tax Regs.,

on which petitioner relies and to which section 1.472-1(a),

Income Tax Regs., inter alia, refers, merely defines the term

"cost", one of the two commonly used bases of inventory valuation

---

[11]  We also find petitioner's reliance on Rev. Rul. 60-321, 1960-2 C.B. 166, to be misplaced.  Petitioner argues that, because that ruling permitted a dealer in securities, which are intangibles, to account for such securities under the LIFO inventory method, Consolidated should be permitted to elect the LIFO inventory method for the inventoriable costs of its labor and overhead, which also are intangibles, even though they are not goods.  Rev. Rul 60-321, supra, holds only that a taxpayer is permitted to elect the LIFO inventory method for the intangible goods, securities.

that satisfy the requirements of section 471, to mean in the case

of inventories for goods in process and for finished goods--

> (1) the cost of raw materials and supplies entering
> into or consumed in connection with the product,
> (2) expenditures for direct labor, and (3) indirect
> production costs incident to and necessary for the
> production of the particular article * * *

The foregoing definition of the term "cost" does not transform

the latter two items in that definition (viz, in the instant case

labor and overhead) into goods subject to inventory as to which a

taxpayer may elect the LIFO inventory method under section 472.

In other words, just because the costs of the labor and overhead

involved here are two of the three basic elements of cost that

were reflected in Consolidated's inventories for goods in process

and for finished goods, see sec. 1.471-4(a), Income Tax Regs.,

does not convert labor and overhead into goods themselves as to

which Consolidated could have elected the LIFO inventory method

under section 472.

Nor does the fact that the cost of Consolidated's new parts,

one of the two raw materials used by Consolidated in its

remanufacturing business, is a third basic element of cost that

also was reflected in Consolidated's inventories for goods in

process and for finished goods, see id., mean that its labor and

overhead, when combined with its new parts, become goods as to

which Consolidated could have elected the LIFO inventory method

under section 472.  As stated above, the goods produced by

Consolidated are remanufactured automobile parts or a type or

class of such goods (e.g., remanufactured automobile engines). Although Consolidated's new parts, labor, and overhead enter into the production, and thus are components, of those goods, another raw material, indeed the principal raw material, that enters into the production, and thus is a component, of the goods produced by Consolidated is the customer cores. The labor and overhead involved in this case are not goods. The new parts, labor, and overhead involved in this case, when taken together but without customer cores, do not constitute goods. However, the new parts, labor, overhead, and customer cores involved in this case, when taken together, do constitute goods and are included in and comprise Consolidated's inventories for goods in process and for finished goods.

Section 472(a) allows a taxpayer to elect the LIFO inventory method in inventorying goods specified in the taxpayer's application. That section does not state that a taxpayer may elect the LIFO inventory method in inventorying other than a good. Nor does that section state that a taxpayer may elect the LIFO inventory method in inventorying a portion of a good. The labor and overhead involved here are not a good, let alone the entire good, of Consolidated subject to inventory, even though they (1) enter into the production of Consolidated's finished goods (viz, remanufactured automobile parts) by transforming Consolidated's customer cores and new parts into such goods and (2) are included, along with customer cores and new parts, in

Consolidated's inventories for goods in process and for finished goods. Nor do the labor and overhead involved here become a good, let alone the entire good, of Consolidated subject to inventory when the new parts involved here are combined with them. The goods of Consolidated subject to inventory as to which it was permitted by section 472(a) and the regulations thereunder to elect the LIFO inventory method are the remanufactured automobile parts produced by Consolidated, a type or class of those goods (e.g., remanufactured automobile engines), and, if Consolidated had made the election permitted by section 1.472-1(c), Income Tax Regs., which it did not, its raw material goods (i.e., customer cores and/or new parts).

We conclude that section 472(a) requires a taxpayer who wants to elect the LIFO inventory method (1) to make that election with respect to a good or goods, which are subject to inventory and specified in a Form 970 and which could include one or more raw material goods used by a manufacturer or processor that will become part of the merchandise intended for sale, see sec. 1.472-1(c), Income Tax Regs., and (2) to make that election with respect to such entire good or goods. That section does not permit, and we do not construe it to allow, a taxpayer to make such an election (1) with respect to other than such a good or goods or (2) with respect to a portion thereof. If Congress had intended to permit such an election under section 472, it would have so provided in that section. It did not.

Petitioner also relies on section 1.472-1(c), Income Tax Regs., to support the validity of Consolidated's LIFO method. Petitioner asserts:

> Respondent apparently believes that Treasury Regulation 1.472-1(c) supports her position in this matter. To the contrary. Treasury Regulation Section 1.472-1(c) contradicts her argument that the LIFO inventory method may only be elected with respect to goods. Under the raw material content method, a taxpayer's LIFO election is limited to the cost of raw materials, including the cost of the raw material content of work-in-progress and finished goods. Treas. Reg. § 1.472-1(c). The Regulation describes the manner in which a taxpayer may segregate the cost of one or more raw materials from work-in-progress and finished goods and value those costs using LIFO, while all other costs associated with work-in-progress and the finished good are valued under the FIFO convention. Thus, a taxpayer using the raw material content method elects to value the cost of raw materials (including the cost of raw materials incorporated into work-in-progress and finished goods) using the LIFO convention, not the raw material themselves. Rather than support her position in this matter, Treasury Regulation Section 1.472-1(c) provides further evidence of the validity of Petitioner's [sic] LIFO election. In addition, Respondent's attempt to characterize the raw material content method as the single "permissive variance to the inclusion of the total goods in LIFO" is not an accurate statement of the law. * * *

We disagree with the foregoing contentions of petitioner as to what section 1.472-1(c), Income Tax Regs., which permits a taxpayer to elect what we shall refer to as the raw material content LIFO inventory method, provides and allows. We reject petitioner's position that that regulation "contradicts * * * [respondent's] argument that the LIFO inventory method may only be elected with respect to goods." Section 1.472-1(c), Income Tax Regs., which is virtually identical to the 1944 amendment to

section 29.22(d)-1 of Regulations 111, provides in pertinent

part:

> (c) A manufacturer or processor who has adopted the LIFO inventory method as to a class of goods may elect to have such method apply to the raw materials only (including those included in goods in process and in finished goods) expressed in terms of appropriate units.  If such method is adopted, the adjustments are confined to costs of the raw material in the inventory and the cost of the raw material in goods in process and in finished goods produced by such manufacturer or processor and reflected in the inventory.  * * *

Section 1.472-1(j), Income Tax Regs., as did the 1944 amendment

to section 29.22(d)-1 of Regulations 111, states that the

election under section 1.472-1(c), Income Tax Regs., may "apply

to any one raw material, when two or more raw materials enter

into the composition of the finished product".  We disagree with

petitioner's assertions that, under section 1.472-1(c), Income

Tax Regs.,

> a taxpayer's LIFO election is limited to the cost of raw materials, including the cost of the raw material content of work-in-progress and finished goods. * * * [A] taxpayer using the raw material content [LIFO inventory] method elects to value the cost of raw materials (including the cost of raw materials incorporated into work-in-progress and finished goods) using the LIFO convention, not the raw materials themselves. * * *[12] [Emphasis added.]

---

[12]  Petitioner also contends that, because the examples in sec. 1.472-1(c), Income Tax Regs., illustrate the manner in which a raw material may be accounted for on the raw material content LIFO inventory method and labor and overhead on the FIFO inventory method,

> It is not logical to conclude that when LIFO is elected for one raw material, together with labor and overhead,

(continued...)

Pursuant to section 1.472-1(c), Income Tax Regs., a manufacturer or processor "may elect to have such [LIFO inventory] method apply to the raw materials only (including those included in goods in process and in finished goods)"; such an election is not made with respect to the costs of such raw materials. Petitioner takes the reference in section 1.472-1(c), Income Tax Regs., to "costs of the raw material" out of context and misstates the reason for that reference in that regulation. Once a manufacturer or processor has elected the raw material content LIFO inventory method as to one or more raw materials (including those included in goods in process and in finished goods), such a taxpayer is required by section 472(b)(2) to inventory such raw material(s) at cost. That is why section 1.472-1(c), Income Tax Regs., states:

> If such method [the raw material content LIFO inventory method] is adopted, the adjustments are confined to costs of the raw material in the inventory and the cost of the raw material in goods in process and in finished

_____

(...continued)
   that a second raw material cannot be valued under FIFO
   * * *

We disagree.  The examples in sec. 1.472-1(c), Income Tax Regs., merely illustrate how the adjustments should be made under the raw material content LIFO inventory method.  Even if a taxpayer were to rely on those examples in calculating the adjustments under such taxpayer's LIFO inventory method, that taxpayer would not be able to use such a method unless it were permitted by or not inconsistent with sec. 472 and the regulations thereunder.

goods produced by such manufacturer or processor and reflected in the inventory. * * *[13] [Emphasis added.]

We also disagree with petitioner's contention that section 1.472-1(c), Income Tax Regs., "provides * * * evidence of the validity of Petitioner's [sic] LIFO election."  As discussed above and as made clear by that regulation, a manufacturer or processor may elect to apply the LIFO inventory method to one or more raw materials only, including those included in goods in process and in finished goods.  Consolidated could have elected, but did not elect, to apply the raw material content LIFO inventory method to its new parts and/or its customer cores. Sec. 1.472-1(c), Income Tax Regs.  It could not have elected to apply that method to its new parts, labor, and overhead only or to its labor and overhead only.  Id.  We conclude that section 1.472-1(c), Income Tax Regs., does not permit Consolidated's LIFO method and does not provide "evidence of the validity of * * * [Consolidated's] LIFO election."[14]

_____

[13]  Under the raw material content LIFO inventory method, "The only adjustment to the closing inventory is the cost of the raw material [for which a taxpayer elects the raw material content LIFO inventory method]; the processing costs and overhead cost are not changed."  Sec. 1.472-1(c), Income Tax Regs., Example (1) (last sentence).

[14]  Although petitioner concedes that it may not be used or cited as precedent, sec. 6110(j)(3), petitioner relies on Tech. Adv. Mem. 94-45-004 (Apr. 25, 1994) in an effort to show that respondent has permitted a taxpayer to account for one or more, but less than all, of its raw materials and all of its labor and overhead under the LIFO inventory method.  It is not at all clear from Tech. Adv. Mem. 94-45-004 what, if any, of the labor and

(continued...)

To the contrary, we find section 1.472-1(c), Income Tax Regs., to be consistent with respondent's position regarding Consolidated's LIFO method.  The Secretary promulgated that regulation under the authority granted by section 472(a) to prescribe regulations "as necessary in order that the use of such [LIFO inventory] method may clearly reflect income".[15]  As discussed above, the raw material content LIFO inventory method authorized by section 1.472-1(c), Income Tax Regs., permits a manufacturer or processor who has adopted the LIFO inventory method with respect to a class of goods to apply that method to "the raw materials only (including those included in goods in process and in finished goods)".  Raw materials are goods.

_____

(...continued)
overhead in question ultimately were allowed to be on, or ultimately were disallowed from being on, the LIFO inventory method upon examination of the income tax returns of the taxpayer.  To the extent that Tech. Adv. Mem. 94-45-004 may be read to suggest that a taxpayer may validly elect the LIFO inventory method with respect to all of its labor and overhead, but not all of its raw materials, that enter into the production of a good or type or class of goods, we reject any such suggestion as contrary to sec. 472 and the regulations thereunder.

[15]  The position of the Secretary in sec. 1.472-1(c), Income Tax Regs., is identical to the position taken by the Commissioner and approved by the Secretary under the original predecessor of sec. 472 (viz, sec. 22(d)(2) of the 1939 Code as amended), which was set forth in the 1944 amendment to sec. 29.22(d)-1 of Regulations 111.  We have found nothing in sec. 472, its predecessor provisions, or their legislative history which establishes that sec. 1.472-1, Income Tax Regs., and its predecessor regulations, as they relate to the raw material content LIFO inventory method, were intended to be anything other than a proper interpretation of the statutory language under which those regulations were promulgated.

Section 1.472-1(c), Income Tax Regs., is consistent with section 472(a) and section 1.472-1(a), Income Tax Regs., which require a taxpayer who wants to elect the LIFO inventory method to make that election with respect to a good or goods, which are subject to inventory and specified in a Form 970, and with respect to such entire good or goods.  When a manufacturer or processor elects the raw material content LIFO inventory method under section 1.472-1(c), Income Tax Regs., the good or goods specified in a Form 970 to which that method applies are one or more raw materials, and not the goods produced or processed by such a taxpayer, and that method must be applied to such entire raw material goods.  See sec. 1.472-1(c), (j), Income Tax Regs.

Respondent also points to section 472(b) in support of respondent's position that Consolidated's LIFO method is contrary to the requirements of section 472 and the regulations thereunder.  We agree.  Section 472(b) states: "In inventorying goods specified in the application described in subsection (a), the taxpayer shall * * * (2) Inventory them at cost".  Section 472(b) thus requires a taxpayer who has elected the LIFO inventory method under section 472(a) to inventory the good or goods specified in a Form 970 at cost.  That section does not permit, and we do not construe it to allow, a taxpayer to inventory at cost (1) other than such a good or goods or (2) a portion of such a good or goods.

As further support for respondent's position that Consolidated's LIFO method contravenes the requirements of section 472 and the regulations thereunder, respondent directs our attention to section 1.472-8, Income Tax Regs., the regulations under section 472 relating to the dollar-value LIFO inventory method.  According to respondent, Consolidated's LIFO method contravenes those regulations.[16]  We agree.  Regardless of the different types of pools that a taxpayer may use if such taxpayer elects the dollar-value LIFO inventory method (e.g., natural business unit pools, multiple pools, or pools established under the IPI computation method), that method must be used with respect to a good or goods subject to inventory and specified in a Form 970 and with respect to such entire good or goods.  See sec. 1.472-8(b), (e), Income Tax Regs.

---

[16]  Petitioner argues that respondent's contention that Consolidated's LIFO method contravenes the dollar-value LIFO inventory method regulations under sec. 472 is a new matter in respect of which the burden of proof is on respondent under Rule 142(a).  We disagree.  The determinations in the 1990 notice and the 1991 notice are stated quite broadly, and we construe them to encompass respondent's contentions relating to Consolidated's dollar-value LIFO inventory method.  Respondent determined in the 1990 notice: "Since you did not include the cost of yard cores in the LIFO calculation of inventory for taxable year 1990 as required in accordance with your LIFO election, taxable income is increased by the amount of your LIFO reserve".  An identical determination for 1991 appears in the 1991 notice.  Even if we were not to address respondent's argument under the regulations relating to the dollar-value LIFO inventory method because it is a new matter, our holding regarding Consolidated's LIFO method would not change.

To illustrate, pursuant to the rules for establishing natural business unit pools, a pool is to consist of all items entering into the entire inventory investment for a natural business unit of a business enterprise,[17] unless the taxpayer elects to use the multiple pooling method provided in section 1.472-8(b)(3), Income Tax Regs.  If a business enterprise is comprised of only one natural business unit, one pool is to be used for "all of its inventories, including raw materials, goods in process, and finished goods".  Sec. 1.472-8(b)(1), Income Tax Regs.  If a business enterprise is composed of more than one natural business unit, more than one pool is required.  Id.

To illustrate further, a taxpayer may elect to establish multiple pools for inventory items that are not within a natural business unit as to which the taxpayer has adopted the natural business unit method of pooling as provided in section 1.472-8(b)(1), Income Tax Regs.  Sec. 1.472-8(b)(3)(i)(a), Income Tax Regs.  In the event of such an election, each such pool is ordinarily to consist of a group of inventory items that are substantially similar, which is to be determined based on all the

---

[17]  Whether an enterprise consists of more than one natural business unit is a matter of fact to be determined from all the circumstances.  Sec. 1.472-8(b)(2)(i), Income Tax Regs.  In the case of a manufacturer, like Consolidated, a natural business unit "ordinarily consists of the entire productive activity of the enterprise within one product line or within two or more related product lines including * * * the obtaining of materials, the processing of materials, and the selling of manufactured * * * goods."  Id.

facts and circumstances.  Id.  Pursuant to the rules for establishing multiple pools, unprocessed raw materials which are substantially similar are to be pooled together, and goods in process and finished goods in the inventory are to be placed in pools classified by major types or classes of goods.[18]  Sec. 1.472-8(b)(3)(i)(b) and (c), Income Tax Regs.

In the face of various provisions in section 472 and the regulations thereunder that respondent contends, and we agree, are contrary to Consolidated's LIFO method, petitioner argues that taxpayers are afforded great flexibility with respect to the dollar-value LIFO inventory method and computational procedures under that method.  Consequently, according to petitioner, Consolidated should be afforded great flexibility with respect to Consolidated's LIFO method.  In support of that position, petitioner cites section 1.472-1(a), (l) and section 1.472-8(b)(3)(i)(d), Income Tax Regs.

Section 1.472-1(a), Income Tax Regs., provides in pertinent part:

---

[18]  The requirement in sec. 1.472-8(b)(3)(i)(b) and (c), Income Tax Regs., that a taxpayer establish pools by major types of materials or major classes of goods does not preclude the establishment of a miscellaneous pool.  Because a taxpayer may elect the dollar-value LIFO inventory method with respect to all or any designated goods in such taxpayer's inventory, there may be a number of such inventory items covered in the election.  A miscellaneous pool is to consist only of items that are relatively insignificant in dollar value when compared to other inventory items in the particular trade or business and that are not properly includible as part of another pool.  Sec. 1.472-8(b)(3)(i)(d), Income Tax Regs.

The LIFO inventory method is not dependent upon the character of the business in which the taxpayer is engaged or upon the identity or want of identity through commingling of any of the goods on hand, and may be adopted by the taxpayer as of the close of any taxable year.

The foregoing regulation does not permit a taxpayer flexibility to elect a LIFO inventory method that is contrary to the requirements of section 472 and the regulations thereunder.

Section 1.472-1(l), Income Tax Regs., provides:

If a taxpayer uses consistently the so-called "dollar-value" method of pricing inventories, or any other method of computation established to the satisfaction of the Commissioner as reasonably adaptable to the purpose and intent of section 472 and this section, and if such taxpayer elects under section 472 to use the LIFO inventory method authorized by such section, the taxpayer's opening and closing inventories shall be determined under section 472 by the use of the appropriate adaptation. * * *

Petitioner directs us to the reference in the foregoing regulation to "any other method of computation".  Consolidated elected the dollar-value LIFO inventory method in the 1980 Form 970 and the 1982 Form 970.  It did not elect "any other method of computation" referred to in the foregoing regulation.  Even if Consolidated had used any such other method, it would have been required to establish to the satisfaction of respondent that such other method is "reasonably adaptable to the purpose and intent of section 472 and" the regulations thereunder.  Consolidated has failed to make such a showing to respondent or to the Court.

Petitioner also argues that section 1.472-8(b)(3)(i)(d), Income Tax Regs., supports its position that Consolidated should

be afforded great flexibility regarding its LIFO method.  That regulation provides in pertinent part that "a taxpayer may elect the dollar-value LIFO inventory method with respect to all or any designated goods in his inventory".  Contrary to petitioner's argument, we find that the foregoing language in section 1.472-8(b)(3)(i)(d), Income Tax Regs., supports respondent's position and is consistent with section 472(a) which requires a taxpayer who elects the LIFO inventory method to make that election with respect to a good or goods subject to inventory and specified in a Form 970.[19]

The issue relating to Consolidated's LIFO method is one that is answered by the requirements of section 472 and the regulations thereunder.  The Court has no flexibility to rewrite section 472.  Our flexibility to reject the legislative regulations under section 472 that are implicated here is quite limited; those regulations must be upheld unless they are arbitrary, capricious, or manifestly contrary to section 472.

---

[19]  Petitioner also cites the following cases in support of its contention that this Court has shown a willingness to allow flexibility with respect to the dollar-value LIFO inventory method and computational matters relating thereto:  Richardson Invs., Inc. v. Commissioner, 76 T.C. 736 (1981); Fox Chevrolet, Inc. v. Commissioner, 76 T.C. 708, 727 (1981); and Amity Leather Prods. Co. v. Commissioner, 82 T.C. 726, 734 (1984).  In each of those cases, the taxpayer elected the LIFO inventory method as to a good or goods or a type or class of goods and as to such entire good or goods or type or class thereof.  In none of those cases was the Court presented with the issue that we now are addressing.

Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 844 (1984).

Petitioner also contends that section 472 and its predecessor provisions in the Internal Revenue laws have been interpreted broadly and that the Court should interpret that section broadly in this case and find that Consolidated's LIFO method does not contravene it or the regulations thereunder. In support of that contention, petitioner cites several cases, including Hutzler Bros. Co. v. Commissioner, 8 T.C. 14, 29 (1947). We find all of those cases to be distinguishable and petitioner's reliance on them to be misplaced. In the interest of brevity, we shall discuss only the Hutzler Bros. Co. case.

Because of the number and diversity of the goods of the taxpayer involved in Hutzler Bros. Co. v. Commissioner, supra, the taxpayer, a department store retailer, devised a LIFO inventory method that reduced the goods to their lowest common denominator, viz, a dollar figure. That method, which is now known as the dollar-value LIFO inventory method, was not expressly permitted by regulation for the year before the Court in the Hutzler Bros. Co. case. Hutzler Bros. Co. v. Commissioner, supra at 24. The only method for that year that was permitted by the regulations under section 22(d) of the 1939 Code as amended, a predecessor of section 472, was a method that required the identification of specific goods in a taxpayer's inventory, a method known as the specific goods LIFO inventory

method, see sec. 1.472-2, Income Tax Regs.  The Court in <u>Hutzler</u> <u>Bros. Co. v. Commissioner</u>, <u>supra</u>, reviewed the legislative history of not only section 22(d) of the 1939 Code as amended, which was applicable to the year at issue, but also section 22(d) of the 1938 Act, 52 Stat. 459, and concluded that "the purpose of the lawmakers was to have it [the LIFO inventory method] apply in general terms to all those coming within its provisions."  <u>Id.</u> at 29.  The Court explained that, in contrast to the determination under the LIFO inventory method of the merchandise to which a cost is to be attributed in the case of a manufacturer, the determination under the LIFO inventory method of the merchandise to which a cost is to be attributed "becomes difficult in the case of a retail merchant primarily because of the complications of the retail method itself."  <u>Id.</u> at 30.  The Court added:

> The * * * process engaged in by petitioner [a retail merchant] is to reduce the price level of the retail stock to that prevailing as of the opening inventory, and thereby to identify the merchandise remaining in inventory at the close of the year as that constituting inventory at the beginning of the year to the extent of the size of the opening inventory.  That this is done by dealing with the merchandise stated in terms of dollars rather than of numbers or quantities is a requisite of the aspect of department store accounting which relies for its inventory volume on a statement in dollars alone.  [<u>Id.</u>]

The Court rejected respondent's contention that stating inventory in terms of "dollars instead of other measures of quantity has the effect of distorting the inventory content", pointing out that the "retail method has been used with respondent's complete

approval for too long a time for the assumption to be permissible that the contents of an inventory can not be satisfactorily represented for all purposes by its expression in dollars only". Id. The Court then examined the LIFO inventory method used by Hutzler Brothers Company and held that that method was permitted by section 22(d) of the 1939 Code as amended and clearly reflected income even though it was not expressly permitted by the regulations under that section. Id. at 28-31.

Although we find Hutzler Bros. Co. v. Commissioner, supra, to be distinguishable from the instant case, the following explanation by the Court in that case of the LIFO inventory method is instructive and rejects petitioner's position here:

> The process envisaged by Lifo involves not so much the ascertainment of cost as the ascertainment of what it is of which we are to discover the cost. The last in, first out formula assumes that the merchandise remaining in inventory is that which was first purchased. * * *
>
>     *     *     *     *     *     *     *
>
> If we were dealing with a fabricator or manufacturer, the first step would be to determine which merchandise it is to which a cost is to be attributed, and the second, to determine that cost. * * * [Emphasis added.]

Hutzler Bros. Co. v. Commissioner, supra at 30. We see no reason to elaborate further on the foregoing succinct explanation in the Hutzler Bros. Co. case regarding what the "process envisaged by" the LIFO inventory method is.

We conclude that petitioner has not shown that respondent abused respondent's discretion in determining that Consolidated's LIFO method is contrary to the requirements of section 472 and the regulations thereunder and that therefore that method does not clearly reflect income.

We shall next address the parties' dispute over whether respondent abused respondent's discretion in terminating Consolidated's election to use Consolidated's LIFO method because that method does not clearly reflect income. Petitioner contends that in the event that the Court were to find that Consolidated's LIFO method does not clearly reflect income, respondent would not be permitted to terminate Consolidated's election to use that method provided that Consolidated agrees to account for its customer cores under the LIFO inventory method and to make any necessary adjustments resulting therefrom.[20] Petitioner asserts:

[20] In conceding that Consolidated would have to make "any necessary adjustments", we believe that petitioner is acknowledging that Consolidated would be required to produce the books and records needed to make such adjustments. However, petitioner did not produce at trial any of Consolidated's books and records that would be required to make "any necessary adjustments". Instead, without even indicating on brief whether or not Consolidated has the books and records to make "any necessary adjustments", petitioner takes the position that respondent must establish that Consolidated does not have such books and records because whether or not it does is a new matter on which respondent has the burden of proof. We disagree. It is petitioner who is claiming that Consolidated should be permitted to modify its LIFO election to include customer cores provided that, inter alia, Consolidated establishes that it can, and does, make "any necessary adjustments". Petitioner has failed to establish its ability to make such adjustments.

It would be unreasonable, unduly punitive, and constitute an abuse of her discretion for Respondent to terminate * * * [Consolidated's] LIFO election because Petitioner has sought judicial review of her determination that it is essential to a clear reflection of income that its [customer] core inventory be included in the LIFO election.

In support of its position, petitioner cites, inter alia, Rev. Proc. 79-23, 1979-1 C.B. 564, and section 1.472-3(c), Income Tax Regs.[21]

We first turn to Rev. Proc. 79-23, supra, on which petitioner relies. Petitioner contends that Rev. Proc. 79-23, supra, "provides that a termination of a taxpayer's LIFO election may be warranted only where one of four specified circumstances exists". Petitioner maintains that the present case does not involve any of those four situations.[22] We note initially that

---

[21] Petitioner also cites Tech. Adv. Mem. 79-47-001 (July 25, 1979) to show "that Respondent has previously recognized that a taxpayer may contest her determination regarding LIFO inventory matters without the threat of having its LIFO election terminated." Petitioner's reliance on Tech. Adv. Mem. 79-47-001 is misplaced. Tech. Adv. Mem. 79-47-001, which has no precedential value, sec. 6110(j)(3), involved an adjustment proposed by the District Director pursuant to sec. 1.472-4, Income Tax Regs., to "perfect the [taxpayer's] LIFO election", and not a termination of that election. To the extent that Tech. Adv. Mem. 79-47-001 may be read to suggest that respondent does not have the authority in this case to terminate Consolidated's election to use Consolidated's LIFO method, such a reading is wrong. See sec. 446(b); sec. 1.472-3(d), Income Tax Regs.

[22] Petitioner further contends that the exclusion of customer cores from Consolidated's LIFO pools fits within one or both of the following situations described in sec. 3.02(b) and (d) of Rev. Proc. 79-23, 1979-1 C.B. 564, 565, as to which respondent has indicated termination of a LIFO election is not warranted:

(continued...)

Rev. Proc. 79-23, supra, does not provide the only circumstances in which respondent will, in respondent's discretion, terminate a taxpayer's LIFO election.  In any event, one of the four situations described in Rev. Proc. 79-23, supra, in which respondent will, in respondent's discretion, terminate such an election is found in section 3.01(b) of that revenue procedure, viz, "Failure by the taxpayer to properly elect the LIFO method".  That situation exists in the instant case.  We have held that, contrary to the requirements of section 472 and the regulations thereunder, Consolidated's LIFO election did not apply to an entire good or goods subject to inventory and specified in a Form 970.  Consequently, Consolidated failed "to properly elect the

---

[22](...continued)
      (b) Selection by the taxpayer of a fewer or greater number of inventory pools than those determined by an examining agent;

            *     *     *     *     *     *     *

      (d) The taxpayer improperly including (or excluding) a specific item in a particular inventory pool * * *

We do not believe that the situation presented here is described in sec. 3.02(b) or (d) of Rev. Proc. 79-23, supra.  Respondent does not take the position that Consolidated selected too few or too many inventory pools, nor does respondent take the position that Consolidated improperly included or excluded a specific item in a particular inventory pool.  Respondent is arguing, inter alia, that, regardless of the different types of pools that a taxpayer may use if such taxpayer elects the dollar-value LIFO inventory method, that method must be used with respect to a good or goods subject to inventory and specified in a Form 970 and with respect to such entire good or goods.

LIFO method" when it filed the 1980 Form 970 and the 1982 Form 970.[23]

We now turn to section 1.472-3(c), Income Tax Regs., on which petitioner relies. That regulation provides:

> As a condition to the taxpayer's use of the LIFO inventory method, the Commissioner may require that the method be used with respect to goods other than those specified in the taxpayer's statement of election if, in the opinion of the Commissioner, the use of such method with respect to such other goods is essential to a clear reflection of income.

Petitioner contends that in the instant case the foregoing regulation "does not authorize Respondent to terminate a taxpayer's LIFO election". Petitioner's reliance on section 1.472-3(c), Income Tax Regs., is misplaced. That regulation authorizes respondent to require a taxpayer who has elected the LIFO inventory method with respect to an entire good or goods subject to inventory and specified in a Form 970 to apply the LIFO inventory method to any other such good or goods but not specified in that form. In the present case, respondent is not seeking to require Consolidated, which did not elect the raw material content LIFO inventory method, to apply the LIFO inventory method to a good or goods subject to inventory but not specified in the 1980 Form 970 and the 1982 Form 970. Conse-

---

[23] We reject the suggestion of petitioner that sec. 3.01(b) of Rev. Proc. 79-23, supra at 564, applies only to the procedural requirements for electing the LIFO inventory method. See Rev. Proc. 76-28, 1976-2 C.B. 645.

quently, section 1.472-3(c), Income Tax Regs., is not apposite here.

The pertinent authority governing disposition of the issue regarding respondent's termination of Consolidated's LIFO election is section 446(b) and section 1.472-3(d), Income Tax Regs. Section 446(b) provides:

> (b) Exceptions.--If no method of accounting has been regularly used by the taxpayer, or if the method used does not clearly reflect income, the computation of taxable income shall be made under such method as, in the opinion of the Secretary, does clearly reflect income.

The foregoing section permits respondent to terminate a taxpayer's method of accounting that does not clearly reflect income (here, Consolidated's LIFO method) and to require the taxpayer to use a method (here, the FIFO inventory method) that does clearly reflect income.

Section 1.472-3(d), Income Tax Regs., provides:

> (d) Whether or not the taxpayer's application for the adoption and use of the LIFO inventory method should be approved, and whether or not such method, once adopted may be continued, and the propriety of all computations incidental to the use of such method, will be determined by the Commissioner in connection with the examination of the taxpayer's income tax returns.

Under the foregoing regulation, it is within respondent's discretion to determine whether or not a "taxpayer's application for the adoption and use of the LIFO inventory method should be approved * * * and * * * continued".

We conclude that petitioner has not shown that respondent abused respondent's discretion in terminating Consolidated's election to use Consolidated's LIFO method.

Amounts at Which Customer Cores Should Be Reflected in Inventory

As permitted by section 1.471-2(c), Income Tax Regs., Consolidated chose to apply the LCM basis of valuation in accounting for its customer cores under the FIFO inventory method.  In applying LCM in its returns for the years at issue, Consolidated reflected the customer cores (1) in its finished goods inventory at core supplier amounts and (2) in its unprocessed cores raw material inventory and its goods in process inventory at scrap value.  Respondent determined that Consolidated's FIFO-LCM method did not reflect the customer cores in its inventories at the proper amounts.  We must decide whether respondent abused respondent's discretion in making that determination.  That inquiry requires us, inter alia, to determine the cost and the market for Consolidated's customer cores for purposes of section 471.

As we understand it, it is petitioner's position that Consolidated's FIFO-LCM method conforms to GAAP and clearly reflects income.  Respondent disagrees.  For financial reporting purposes, Consolidated reflected its customer cores in all of its inventories at core supplier amounts.  However, for tax purposes, Consolidated reflected customer cores in its finished goods inventory at core supplier amounts; it reflected customer cores

in its unprocessed cores raw material inventory and its goods in process inventory at scrap value. On the record before us, we find that petitioner has not met its burden of establishing that Consolidated's FIFO-LCM method conforms to GAAP or that that method otherwise satisfies the requirement in section 471 that it conform "as nearly as may be to the best accounting practice in the trade or business".

We shall now consider whether Consolidated's FIFO-LCM method satisfies the requirement under section 471 that that method clearly reflect income. In support of that position, petitioner contends that Consolidated obtained customer cores in exchange, and not purchase, transactions and that therefore the cost and the market for those cores for purposes of section 471 are to be determined on the basis of the respective fair market values of those cores. According to petitioner, those values were either the salvage yard cost for non-bin salvage yard cores or the scrap value for bin salvage yard cores that did not pass inspection at Bishop Engine's place of business.[24]

---

[24] Petitioner asserts on brief:

[T]he price paid [the salvage yard cost] by core suppliers to purchase cores from salvage yards on an individual basis [non-bin salvage yard cores] should be determinative of the actual value of cores received by * * * Consolidated from its customers. In this regard, at trial Mr. Bishop, the President of one of the largest core suppliers in the country, testified that the cores received by remanufacturers from their customers are the cores [bin salvage yard cores which

(continued...)

Petitioner further asserts that even if the Court were to find that the transactions by which Consolidated acquired customer cores were purchases, and not exchanges, only the respective fair market values of those cores are the cost and the market for purposes of section 471 and that the alleged excesses

---

24(...continued)
did not pass inspection at Bishop Engine's place of business] that core suppliers do not ordinarily purchase from salvage yards, except at scrap value. Thus, for a substantial number of the cores received by * * * Consolidated from its customers, the fair market value of such cores is, as correctly reported on its 1990 and 1991 federal income tax returns, scrap value. * * * [Citations omitted.]

Assuming arguendo that fair market value were the proper criterion under sec. 471, petitioner's position regarding what the fair market values of its customer cores were appears to be inconsistent. On the one hand, petitioner contends that the salvage yard cost for non-bin salvage yard cores "should be determinative of the actual value of" Consolidated's customer cores. On the other hand, petitioner asserts that "Mr. Bishop * * * testified that the" customer cores of the type acquired by Consolidated are comparable to bin salvage yard cores which did not pass inspection at Bishop Engine's place of business and which were purchased by core suppliers from salvage yards at scrap value. Consequently, according to petitioner "for a substantial number of" Consolidated's customer cores, the fair market value was scrap value. In any event, even assuming arguendo that we were to agree with petitioner that either the salvage yard cost for non-bin salvage yard cores or the scrap value for bin salvage yard cores which did not pass inspection at Bishop Engine's place of business is the determinant of the cost and the market for customer cores for purposes of sec. 471, which we do not, petitioner has not established either what those amounts were or that, "for a substantial number" of customer cores, those amounts did not exceed scrap value. Moreover, petitioner concedes that at least with respect to other than "a substantial number" of Consolidated's customer cores, Consolidated erred when it included in its returns those cores in its unprocessed raw materials inventory and in its goods in process inventory at scrap value.

over such cost and market that Consolidated credited to each
customer account receivable are deductible expenses under section
162.

In support of respondent's position that Consolidated's
FIFO-LCM method does not clearly reflect income, respondent
contends that Consolidated acquired customer cores in purchase,
and not exchange, transactions and that therefore the cost and
the market for those cores for purposes of section 471 are to be
determined by reference to the invoice prices that were shown on
the customer core sales invoices.  According to respondent, those
invoice prices are the amounts (viz, the core credit amounts)
that Consolidated credited to each customer account receivable
and that were shown on those invoices under the column headed
"Cores--Price Each".[25]

Respondent further asserts that even if the Court were to
find that the transactions by which Consolidated acquired
customer cores were exchanges, and not purchases, respondent's

---

[25]  On brief respondent uses the term "core amount" when
refer-ring to the amount that Consolidated credited to each
customer account receivable for each core that it acquired.  In
fact, the amount of such a credit was generally equal to the core
amount, and we assume that respondent uses the term "core amount"
for convenience.  However, because of, inter alia, the condition
of each customer core that a customer decided to deliver to
Consol-idated, it was possible that Consolidated sometimes
credited to a customer account receivable an amount that was less
than the core amount.  Unless we are quoting from the briefs of
the parties, we shall refer to the amounts that Consolidated
credited to each customer account receivable as the core credit
amounts.

position as to what are the cost and the market for Conso-

lidated's customer cores for purposes of section 471 would not

change.

Purchase vs. Exchange Transactions

In support of petitioner's position that Consolidated

acquired customer cores in exchange transactions, petitioner

asserts:

Petitioner's method of obtaining cores from its
customers is, at its root, an exchange of a remanu-
factured automobile part for a sum of money (the
exchange amount) plus the customer's core. * * *
Respondent's attempt to characterize the core
deposit[26] as the "cost" to Petitioner of a core
provided to it by a customer is apparently founded in
Treasury Regulation 1.471-3(b) and assumes that the
core deposit is the "invoice price" of the core.
Respondent's position ignores both the absence of an
"invoice" or "invoice price" relating to a customer
core and the fundamental nature of the transaction
between Petitioner and its customer.

Petitioner's customers do not issue invoices to
Petitioner. On the sale of a remanufactured automobile
part, Petitioner issues an invoice to its customer that
reflects an exchange amount and a core deposit. * * *
The core deposit is reflected on the invoice with the
understanding that the customer can return his or her
core and receive back from Petitioner the full amount
of the core deposit shown. * * * The recording of the
core deposit on Petitioner's invoice is, therefore,
simply the posting of a customer deposit to secure the
return of the customer's core. Further, the refunding
of the core deposit and the issuance of a credit
invoice by Petitioner to a customer simply documents

---

26 Petitioner uses the term "core deposit" on brief
presumably because it contends that the core amount for a
customer core represents a deposit made by Consolidated's
customer to secure "the return of the customer's core", which was
to be refunded at the time that customer decided to deliver a
customer core to Consolidated.

the refunding of that deposit.  Finally, the credit invoice [customer core sales invoice] issued by Petitioner to its customers relates to the sale of the remanufactured automobile part to the customer, not the purchase of a core by Petitioner.  The absence of an invoice or invoice price regarding customer cores is not surprising when the transaction between Petitioner and its customer is analyzed for what it is: an exchange in which the customer's core is received by Petitioner as partial payment for the remanufactured automobile part sold.

When a customer purchases one of Petitioner's remanufactured automobile parts, the customer must either provide to Petitioner a core, corresponding in type and style to the remanufactured automobile part purchased, or post a core deposit with the under-standing that the deposit will be refunded when the customer returns his or her core. * * * If a customer were to provide a core to Petitioner at the time of sale, the existence of the exchange would be indis-putable: the customer receives a remanufactured automobile part in exchange for cash (the exchange amount) and the customer's core.  See Treas. Reg. § 1.1002-1(d)(exchange defined as a reciprocal transfer of property, as distinguished from a transfer of property for a money consideration only).  The fact Petitioner's customers do not generally provide a core to it at the time of sale does not, as Respondent would have this Court hold, transform the transaction into two separate sales.

It is well established "that an integrated transaction may not be separated into components for the purposes of taxation by either the Internal Revenue Service or the taxpayer." Redwing Carriers, Inc. v. Tomlinson, 399 F.2d 652, 658 (5th Cir. 1968); see also Kanawha Gas & Utilities Co. v. Commissioner of Internal Revenue, 214 F.2d 685, 691 (5th Cir. 1954) * * *

                *    *    *    *    *    *    *

In Burrell v. Commissioner, 400 F.2d 682 (10th Cir. 1968), affirming 26 T.C.M. (CCH) 748 (1967), a case factually indistinguishable from the one at bar, the exchange * * * analysis set forth above * * * [was] recognized by both the Tax Court and the Tenth Circuit Court of Appeals.  [Fn. ref. omitted.]

In support of respondent's position that Consolidated acquired customer cores in purchase transactions, respondent asserts:

    The parties have stipulated that when Consolidated sells a remanufactured automobile part to a customer, it receives a total sales amount. * * * The total sales amount, consisting of the exchange amount plus core amount, is taken into income as a cash/credit transaction. * * * A customer core may or may not subsequently be acquired by Consolidated at the core amount.  If it is, this is a separate cash/credit transaction whereby Consolidated is out-of-pocket the core amount. * * * The [customer core sales] invoices * * * use the term "price each", not "refund" or "deposit" when referring to the value given up by Consolidated for cores provided to Consolidated by its customers.  These stipulated facts are not indicative of an "exchange transaction" as advocated by petitioner.  These facts also do not support the proposition that the customer cores are obtained by Consolidated at little or no out-of-pocket cost.

            *    *    *    *    *    *    *

    Petitioner acknowledges that Consolidated's customers do not generally provide a core to Consolidated at the time a remanufactured part is sold. In fact, an entire year may go by before a customer provides a core.  Nevertheless, petitioner presents a scenario in support of the exchange argument in which the core is provided simultaneously.  Petitioner has not established in the record that such a scenario is treated any differently than a normal core acquisition. It is instructive to consider the scenario wherein Consolidated knows, at the time that a remanufactured part is sold, that the customer cannot provide a core. The stipulated facts indicate the customer would still pay the core amount although there is no possible core return to be "secured".

    Petitioner's argument that it acquires cores in an integrated transaction does not comport with the facts. Consolidated's customers are not required to provide a core.  The remanufactured part is not sold to the customer contingent upon a core being provided.  There

is no evidence that any negotiation whatsoever is permitted regarding the price of the remanufactured part.  The customer must pay the stated or list price of the remanufactured part, even if Consolidated knows that the customer will not provide a core.

We have found the following facts on the instant record: At the time a customer purchased a remanufactured automobile part from Consolidated, (1) that customer became obligated to pay Consolidated the remanufactured automobile part sales price which consisted of the exchange amount and the core amount and which, along with the exchange amount and the core amount, Consolidated reflected on the remanufactured automobile part sales invoice that it generated for that sale and (2) Consolidated offered to purchase from that customer a customer core corresponding to that part for the customer core purchase offer amount.  There was no obligation on the part of that customer to deliver a customer core to Consolidated as part of that sale. The remanufactured automobile part sales price, the customer core purchase offer amount, and the core credit amount were determined on the basis of market-related factors, including supply and demand.  Consolidated accounted for each remanufactured automobile part that it sold to a customer by making entries increasing (1) "sales (exchange amount)" by the exchange amount that was part of the remanufactured automobile part sales price for each such part, (2) "sales (core amount)" by the core amount that was part of that price for each such part, and (3) "customer account receivable" by that price for each such part.  If a

customer, even though under no obligation to do so, decided to accept Consolidated's offer to purchase and delivered a customer core to Consolidated and if that core satisfied Consolidated's requirements for acceptance of a customer core, Consolidated (1) purchased that core for a price which generally was equal to the core amount (i.e., the core credit amount) and which was shown on the customer core sales invoice under the column headed "Cores--Price Each" and (2) paid for it by crediting that customer's customer account receivable in an amount equal to that price (viz, the core credit amount).  The customer core purchase offer amount and the core credit amount for each customer core were set at an amount that the marketplace in which Consolidated acquired customer cores demanded.

The facts that we have found on the record in this case and the issue under section 471 that is presented to us distinguish this case from Redwing Carriers, Inc. v. Tomlinson, 399 F.2d 652 (5th Cir. 1968), and Burrell v. Commissioner, 400 F.2d 682 (10th Cir. 1968), affg. T.C. Memo. 1967-160, the principal cases on which petitioner relies to support its position that Consolidated acquired customer cores in exchange, and not purchase, transactions.  Consequently, we find petitioner's reliance on those cases to be misplaced.

The Court of Appeals for the Fifth Circuit began its opinion in Redwing Carriers, Inc. v. Tomlinson, supra, by framing the issue presented to it as follows:

> This case involves another attempt by a taxpayer to insulate himself from the incidence of taxation by means of paper armor. The question presented is whether a taxpayer may shape what is essentially an integrated purchase and trade-in transaction of new and used trucks into two separate transactions in order to recognize an immediate gain at capital gains rates and concomitantly to take a larger depreciation deduction from ordinary income. * * * [Redwing Carriers, Inc. v. Tomlinson, supra at 654.]

The Court of Appeals then recited certain facts relevant to its resolving the foregoing issue, including the following, which it characterized as "indicia of transactional unity". Id. at 655. During 1958, 1959, and 1961, respectively, the taxpayer, a profitable trucking concern and a prestigious account for General Motors Corporation (G.M.C.) and White Motor Company (White), transferred title to 27, 36, and 14 used trucks to G.M.C., and at about the same time the taxpayer's wholly owned subsidiary acquired 28, 36, and 14 new trucks from G.M.C. Id. During 1959, transactions in like form were executed with White. Id. The taxpayer was in a strong bargaining position vis-a-vis G.M.C. and White. Consequently, it succeeded in having the form of each transfer by it of used trucks and each acquisition by its subsidiary of new trucks cast as a sale and a purchase, respectively. It also succeeded in having the aggregate price for such alleged sales set at an amount in excess of the aggregate fair market value of the used trucks that it transferred to G.M.C. and White and the aggregate price for such alleged purchases set at an amount in excess of the aggregate

fair market value of the new trucks that its subsidiary acquired from those companies.  Id.  In negotiating the foregoing transactions with G.M.C. and White, Charles E. Mendez (Mendez), the president and chairman of the board of both the taxpayer and its subsidiary, did not indicate to either G.M.C. or White which corporation he was representing, and it made no difference to G.M.C. or White whether they were dealing with the taxpayer or with its subsidiary.  Id.  Both the taxpayer and its subsidiary used the same address on the checks utilized in the transactions in question even though they were located in different cities in Florida and even though the taxpayer's subsidiary used a different bank account for all of its business activities.  Id. G.M.C. and White delivered most of the trucks acquired in the alleged purchases by the taxpayer's subsidiary directly to the taxpayer even though they were ostensibly being sold to that subsidiary for resale to the taxpayer.  Id.

In addition to reciting the foregoing facts in Redwing Carriers, Inc. v. Tomlinson, supra, the Court of Appeals for the Fifth Circuit observed that "a definite contractual inter-dependency between the sale of new trucks and the trade-in of old trucks" existed, id., in that there "would have been no purchase by * * * [the taxpayer's subsidiary] of new trucks or tractors without concurrent and binding agreements to purchase * * * [the taxpayer's] used equipment", id. (quoting the U.S. District Court's opinion in Redwing Carriers, Inc. v. Tomlinson, 19 AFTR

2d 1253, 67-1 USTC par. 9392 (M.D. Fla. 1967)). The Court of Appeals further noted that, because the aggregate price that G.M.C. paid for the used trucks was in excess of their aggregate fair market value, G.M.C. could have yielded a profit from the transactions in question only by viewing the alleged purchases of used trucks and the alleged sales of new trucks as one transaction. Id. According to the Court of Appeals, the transactions in question were

> sculptured * * * so as to achieve the best possible tax results for Redwing. Instead of obtaining customary discounts from the retail price of the new trucks, Mendez would insist that the manufacturers add the discount amount to the price of the used trucks being repurchased. The gain of the trade-in price over the depreciated basis of the used trucks would be recognized at capital gains rates, and the basis of the new trucks for depreciation purposes would be inflated. As a result, Redwing's depreciation deductions from ordinary income would also be inflated, resulting in considerable tax savings. [Redwing Carriers, Inc. v. Tomlinson, supra at 655-656.]

The Court of Appeals for the Fifth Circuit held in the Redwing Carriers, Inc. case that the transfers of used trucks by the taxpayer and the acquisitions of new trucks by its subsidiary were, in substance, like-kind exchanges. In so holding, the Court stated:

> As is obvious from the above facts, these Mendez-dominated transactions were severable in form only. On substance, the sale was in bondage to the purchase and the purchase indissolubly dependent upon the sale. If Redwing had not carried out the agreement to buy the new trucks, the auto makers would have had no juristic obligation to purchase the used trucks. The buying and selling were synchronous parts meshed into the same transaction and not independent transactions.

* * * * * * *

> Taxation is transactional and not cuneiform. Our tax laws are not so supple that scraps of paper, regardless of their calligraphy, can transmute trade-ins into sales. Although [the taxpayer's] * * * transfers may have been paper sales, they were actual exchanges. A taxpayer may engineer his transactions to minimize taxes, but he cannot make a transaction appear to be what it is not. Documents record transactions, but they do not always become the sole criteria for transactional analysis. [Id. at 656, 659.]

Redwing Carriers, Inc. v. Tomlinson, supra, is distinguishable from the instant case for several reasons, including the following. Unlike the case before us, the Redwing Carriers, Inc., supra, case did not involve the inventory accounting issue under section 471 that is presented here. In Redwing Carriers, Inc. v. Tomlinson, supra, the respective prices at which the old trucks were transferred by the taxpayer and the new trucks were acquired by its subsidiary were set for tax purposes in excess of the aggregate fair market value of those trucks and were therefore not determined on the basis of market-related factors, such as supply and demand, and G.M.C. could have yielded a profit from the transactions in question only by viewing the alleged purchases of used trucks and the alleged sales of new trucks as one transaction. In contrast, we have found in the instant case that the remanufactured automobile part sales price (i.e., the price that Consolidated charged a customer who purchased a remanufactured automobile part) as well as the customer core purchase offer amount and the core credit amount (i.e., the price

that Consolidated paid to acquire a customer core) were determined on the basis of market-related factors, such as supply and demand. We conclude that Redwing Carriers, Inc. v. Tomlinson, 399 F.2d 652 (5th Cir. 1968), does not control our resolution of the issue presented here.

Nor does Burrell v. Commissioner, 400 F.2d 682 (10th Cir. 1968), govern our resolution of the inventory accounting issue under section 471 that is involved in the instant case. In Burrell v. Commissioner, supra, the Court of Appeals for the Tenth Circuit, to which an appeal in this case would generally lie, recited the facts on which it relied as follows:

> In 1962, William P. Burrell,* * * as a sole proprietor, was engaged in reboring automobile engine blocks, called "cores," using them to rebuild automobile engines which he sold to both retail and wholesale customers. In order to maintain an inventory of cores to be rebored, Burrell desired that each customer to whom he sold a rebuilt engine with a rebored core therein, deliver to him the old core in the automobile engine which the rebuilt engine replaced, or a like old core from an automobile engine of the same make.

> The amount of the bill which Burrell rendered to customers who purchased from him rebuilt engines with rebored cores was for a single amount, which, in fact, was made up of two items. Such items were reflected separately on an invoice furnished to the customer. Item One on such invoice was for the rebuilt engine. Item Two was for the core from the old engine, or a substitute therefor, to be delivered to Burrell by the customer.

> * * * * * * *

> When a new core was returned, Item Two was cancelled, although the actual value of the old core did not equal the amount of the Item Two charge. Such

charge was purposely made higher than the value of the old core to be returned, in order to induce customers to return old cores and to enable Burrell to maintain a needed inventory of old cores. Burrell did not strictly enforce the 45-day limit, but accepted old cores tendered to him for credit by customers a considerable time after the 45-day period had expired.

The effect of a transaction between Burrell and a customer was a charge against the customer in one amount, reflected on the bill delivered to him, made up of two items, one being Item One, the charge for the rebuilt engine with a rebored core sold to the customer, payable in cash, and which most customers paid on receipt of the bill; and the other, Item Two, to be paid by the return of a like core to Burrell within 45 days, or if not returned within 45 days, to be paid in full, in cash. The reason Burrell did not strictly enforce the 45-day time limit was that he preferred old cores to cash.

Burrell carried on his books an account referred to as "Customer Core Deposits." It reflected the amounts of Item Two charges which customers would have to pay in cash if they failed to discharge them by the return of an old core. * * *

On November 1, 1962, the Corporation [Engine Rebuilders, Inc.] was organized under the laws of Colorado. On that date, the Corporation, which was wholly owned by the Burrells, took over the wholesale business of Burrell. * * * The Corporation continued to use the same billing and invoice procedures; the same "Customer Core Deposits" account, and generally the same bookkeeping methods that the Burrells had followed.

Burrell v. Commissioner, supra at 683 (fn. ref. omitted). (We shall refer to Burrell and the Corporation collectively as the taxpayers.)

The issue in Burrell v. Commissioner, supra, was whether the taxpayers were required to include the so-called item two charge in income at the time they sold a rebuilt engine. Unlike the

instant case, the Court of Appeals for the Tenth Circuit in the Burrell case was not presented with the inventory accounting question under section 471 of the proper amounts at which the taxpayers were required to reflect the cores that they acquired in their inventories, and that Court did not decide that issue. The Court of Appeals in Burrell v. Commissioner, supra at 685, held that the item two charges should have been included in income at the time the rebuilt engines were sold by the taxpayers.  In dictum, that court suggested that

> there might be some basis for the contention that the amount thereof [the item two charge] did not accrue until the expiration of 45 days from the date of the sale and unless the customer during such period failed to return the replacement core, and that the value of the core returned should be accrued on the date of its return within the 45-day period.  [Id.]

However, the Court of Appeals did not apply the foregoing dictum because "the taxpayers' books were so lacking in completeness, that it would have been impossible to determine the amount the taxpayers should have accrued on that basis."  Id.  Even assuming arguendo that we were to find the above-quoted dictum to be a correct statement of the tax law, we reject petitioner's contention that that dictum controls our resolution of the inventory accounting issue involving Consolidated's customer cores that is presented here.

The facts involved in Burrell v. Commissioner, supra, although they might appear to be facially similar to the facts involved here, are different from the facts established by the

record in the present case.  For example, the Court of Appeals for the Tenth Circuit stated that the item two charge "was purposely made higher than the value of the old core to be returned, in order to induce customers to return old cores and to enable Burrell to maintain a needed inventory of old cores."  Id. at 683.  It is not clear what the Court of Appeals meant by the term "value".  In any event, in the instant case, we have found on the record presented to us that Consolidated determined the price that it was willing to pay to acquire customer cores on the basis of market-related factors, including supply and demand, and that it did not pay more to acquire customer cores than the marketplace in which it acquired those cores demanded.  The Court in Burrell v. Commissioner, supra at 683, also indicated that the taxpayers' books reflected an account called "Customer Core Deposits" which "reflected the amounts of Item Two charges which customers would have to pay in cash if they failed to discharge them by the return of an old core."  In the present case, we have found that at the time of each sale of a remanufactured auto-mobile part the core amount, which was part of the remanufactured automobile part sales price for each such sale, was reflected in Consolidated's books as an entry increasing "sales (core amount)" and as part of an entry (i.e., the remanufactured automobile part sales price) increasing "customer account receivable"; the core amount was not shown in those books as a deposit.

Based on our examination of the entire record in this case, we reject petitioner's position that Consolidated acquired customer cores in exchange transactions in which Consolidated's customers purchased remanufactured automobile parts from it in exchange for the payment by them of the exchange amounts and delivery by them of customer cores to Consolidated. On that record, we find that the substance of the transactions by which Consolidated acquired customer cores were purchases in which Consolidated purchased customer cores for the prices that were shown in the customer core sales invoices under the column headed "Cores--Price Each".

We shall now address what the cost and the market are for purposes of section 471 for the customer cores that Consolidated acquired.[27]

### The Cost for Consolidated's Customer Cores

For purposes of inventory accounting under section 471, the cost of merchandise purchased is determined under section 1.471-3, Income Tax Regs. That section provides in pertinent part:

Cost means:

*     *     *     *     *     *     *

---

[27] Assuming arguendo that we were to have found that Consolidated's acquisitions of customer cores were exchanges, and not purchases, our findings below as to the cost and the market for Consolidated's customer cores for purposes of sec. 471 would not change.

>     (b) In the case of merchandise purchased
> since the beginning of the taxable year, the
> invoice price * * *

Although petitioner disputes that the transactions by which Consolidated acquired customer cores constituted purchases, petitioner agrees with respondent that if the Court were to find that such transactions were purchases, the term "merchandise purchased" in section 1.471-3(b), Income Tax Regs., includes raw materials purchased by a manufacturer, such as the customer cores purchased by Consolidated.  However, petitioner contends that that regulation does not apply in determining the cost of the customer cores acquired by Consolidated because there was no invoice issued by any of Consolidated's customers and no invoice price for any of those cores.  On the record before us, we reject petitioner's contention.  We have found that at or about the time that a customer delivered a customer core to Consolidated, Consolidated prepared a sales invoice[28] (viz, the customer core sales invoice) which identified the type and the number of customer cores of each type that each of its customers delivered to it.  We find no significance for purposes of section 471 and section 1.471-3(b), Income Tax Regs., in the fact that it was Consolidated, and not its customers, that generated the customer core sales invoices.  We also have found that the price which

---

[28]    Indeed, petitioner stipulated that the customer core sales invoice prepared by Consolidated was a "sales invoice". Attached to each customer core sales invoice was, inter alia, a completed copy of a request for core credit.

Consolidated paid for each customer core delivered to it by a customer (viz, the core credit amount) was shown on each of the customer core sales invoices under the column headed "Cores-- Price Each".

Petitioner further contends that section 1012 and the regulations thereunder relating to the cost basis of property require Consolidated to ascertain the respective fair market values of the customer cores that it acquired in determining the cost of those cores for purposes of section 471. According to petitioner, the core credit amount for each customer core which Consolidated acquired exceeded its fair market value, and the aggregate amount of such alleged excesses is deductible under section 162 as an amount expended to protect and promote Consolidated's supply of raw materials. We disagree with petitioner's position that section 1012 and the regulations thereunder are determinative of the cost of Consolidated's customer cores for purposes of section 471. Those provisions do not control the determination of the proper amounts at which property must be reflected in a taxpayer's inventories for purposes of section 471. The regulations under section 1013 relating to the basis of property included in inventory make it clear that the amounts at which property must be reflected in a taxpayer's inventories are controlled by section 471 and the regulations thereunder. Section 1.1013-1, Income Tax Regs., provides:

The basis of property required to be included in inventory is the last inventory value of such property in the hands of the taxpayer. The requirements with respect to the valuation of an inventory are stated in subpart D (sections 471 and following), part II, subchapter E, chapter 1 of the Code, and the regulations thereunder.

We also reject petitioner's position that the aggregate amount of the alleged excesses of the core credit amounts over the alleged fair market values of Consolidated's customer cores is deductible under section 162. In support of that position, petitioner asserts:

> Even if one regards the refund of the core deposit as "payment" for the core, an artificially or unnecessarily high payment does not change the "cost" of property under the Code. Rather, when a taxpayer pays more than the fair market value for the purchase of an asset and the excess payment is for a purpose other than the acquisition of the property or the transaction is based upon peculiar circumstances which influence the purchaser to pay more than fair market value, the excess amount is excluded from the "cost" of the property. Jordan v. Commissioner, 60 T.C. 872, 879 (1973), aff'd 514 F.2d 1209 (8th Cir. 1975); Majestic Securities Corp. v. Commissioner, 120 F.2d 12, 14-15 (8th Cir. 1941), affirming 42 B.T.A. 698 (1940); New Hampshire Fire Insurance Co. v. Commissioner, 2 T.C. 708, 724 (1943), aff'd, 146 F.2d 697 (1st Cir. 1945). Instead, under such circumstances, cost is determined with reference to the fair market value of the property received. Lemmen v. Commissioner, 77 T.C. 1326, 1348 (1981), acq. 1983-1 C.B. 1.

> As illustrated above, Respondent cannot reasonably dispute that the core deposit for any particular remanufactured automobile part is greatly in excess of the fair market value of the core. In Burrell, the Tenth Circuit found that the core deposit was purposely set higher that [sic] the value of the core "in order to induce the customers to return the old cores and to enable Burrell to maintain a needed supply of cores." Burrell, 400 F.2d at 683. The same is true in the present case.

We find the foregoing cases on which petitioner relies to be distinguishable from the instant case and petitioner's reliance on them to be misplaced.  None of those cases involved the issue of the proper amounts at which a taxpayer must reflect property in such taxpayer's inventories.  Moreover, unlike the cases (viz, Majestic Sec. Corp. v. Commissioner, 120 F.2d 12 (8th Cir. 1941), affg. 42 B.T.A. 698 (1940); Lemmen v. Commissioner, 77 T.C. 1326 (1981); and New Hampshire Fire Ins. Co. v. Commissioner, 2 T.C. 708 (1943), affd. 146 F.2d 697 (1st Cir. 1945)) on which petitioner relies in which the respective purchasers involved there paid more than fair market value for the assets that they purchased, we have found on the record before us that the amounts for which Consolidated acquired customer cores were based on market-related factors, including supply and demand, and were set at amounts that the marketplace in which Consolidated purchased those cores demanded.

On the record before us, we find that for purposes of section 471 the cost for each of the customer cores that Consolidated acquired is the price (viz, the core credit amount for each such core) which it paid for each such core and which is shown under the column headed "Cores--Price Each" on the customer cores sales invoice that was prepared at or about the time a customer delivered such a core to Consolidated.

### The Market for Consolidated's Customer Cores

Petitioner contends that, as a result of "extraordinary

facts and circumstances", section 1.471-4(b), Income Tax Regs., and not section 1.471-4(a), Income Tax Regs., applies in determining the market for Consolidated's customer cores for purposes of section 471.  In support of that contention, petitioner asserts that, unlike the manner in which prices are set under normal market conditions with numerous buyers and sellers operating at arm's length to achieve for themselves the best economic bargain possible, Consolidated intentionally set the core amounts, and consequently the customer core purchase offer amounts and the core credit amounts, at amounts greater than the core supplier amounts that it was paying its core suppliers to purchase core supplier cores which had core supplier guarantees and were of higher quality than customer cores of the same types.[29]  As we understand it, petitioner also contends that section 1.471-4(b), Income Tax Regs., and not section 1.471-4(a), Income Tax Regs., applies because Consolidated did not purchase customer cores in an open market.

Respondent contends that the market for Consolidated's customer cores for purposes of section 471 is determined under section 1.471-4(a), Income Tax Regs.  Respondent further asserts

---

[29]  We are not persuaded on the record before us that Bishop Engine and other core suppliers would not have increased their prices (i.e., the core supplier amounts) for core supplier cores in the event that Consolidated and/or other automobile parts remanufacturers had decided to fill more of their respective core inventory requirements from those core suppliers, rather than from those remanufacturers' customers.

that, pursuant to that section, as interpreted by <u>Thor Power Tool Co. v. Commissioner</u>, 439 U.S. 522 (1979), and <u>Bamert v. Commissioner</u>, 8 B.T.A. 1099 (1927), the market for each of Consolidated's customer cores is the current bid price (i.e., the replacement cost) for a customer core of the same type that was prevailing at the respective dates of Consolidated's inventory in the marketplace in which Consolidated actually participated and that that marketplace is the marketplace in which it obtained customer cores from its customers.  According to respondent, the current bid price or replacement cost for a customer core that was included in Consolidated's inventories at the end of each of the years at issue is the core credit amount for a customer core of the same type that was prevailing at the end of each of those years.

Section 1.471-4(a) and (b), Income Tax Regs., provides in pertinent part:

(a)  Under ordinary circumstances and for normal goods in an inventory, "market" means the current bid price prevailing at the date of the inventory for the particular merchandise in the volume in which usually purchased by the taxpayer, and is applicable in the cases--

(1) Of goods purchased and on hand, and

(2) Of basic elements of cost (materials * * *) in goods in process of manufacture and in finished goods on hand; * * *

(b)  Where no open market exists or where quotations are nominal, due to inactive market conditions, the taxpayer must use such evidence of a fair market price at the date or dates nearest the

inventory as may be available, such as specific purchases or sales by the taxpayer or others in reasonable volume and made in good faith, or compensation paid for cancellation of contracts for purchase commitments. * * *

The Supreme Court of the United States has held that the term "current bid price" used in section 1.471-4(a), Income Tax Regs., is synonymous with the "replacement cost, that is, the price the taxpayer would have to pay on the open market to purchase or reproduce the inventory items." Thor Power Tool Co. v. Commissioner, supra at 534. The current bid price is to be determined based on prevailing prices in the market in which the taxpayer actually participates. D. Loveman & Son Export Corp. v. Commissioner, 34 T.C. 776, 799 (1960), affd. 296 F.2d 732 (6th Cir. 1961); Bamert v. Commissioner, supra at 1100.

Based on our examination of the entire record before us, we find that Consolidated acquired its customer cores under ordinary, and not extraordinary, circumstances. In acquiring customer cores, Consolidated participated in the marketplace in which it purchased those cores from its customers, and not in the marketplace in which it purchased core supplier cores from core suppliers. We further find that petitioner has failed to persuade us either that the marketplace in which Consolidated acquired customer cores from its customers is not an open market in which Consolidated participated within the meaning of section 1.471-4(b), Income Tax Regs., or that Consolidated did not acquire its customer cores in an open market. On the instant

record, we find that section 1.471-4(a), Income Tax Regs., and not section 1.471-4(b), Income Tax Regs., applies in determining the market for Consolidated's customer cores for purposes of section 471.  We further find that the market under section 1.471-4(a), Income Tax Regs., is the replacement cost and that the replacement cost for each of the customer cores of Consolidated that were included in its inventories at the end of each of the years at issue is the core credit amount for a customer core of the same type that was prevailing at the end of each of those years.

Based on our examination of the entire record in this case, we find that petitioner has not shown that respondent abused respondent's discretion in determining that Consolidated's FIFO-LCM method does not clearly reflect income because that method did not reflect the proper amounts for customer cores.

To reflect the foregoing and the concession of petitioner for 1990,

<u>Decision will be entered for respondent</u>.